**PP & L INDUSTRIAL CUSTOMER ALLIANCE, Petitioner,**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued June 6, 2001.

Decided July 10, 2001.

As Amended July 10, 2001.

Pamela C. Polacek, Harrisburg, for petitioner.

John A. Levin, Harrisburg, for respondent.

David M. MacGregor, Philadelphia, for intervenor, PP&L Electric Utilities Corporation.

Before DOYLE, President Judge, COLINS, Judge, McGINLEY, Judge, SMITH, Judge, PELLEGRINI, Judge, KELLEY, Judge, and LEADBETTER, Judge.

PELLEGRINI, Judge.

PP & L Industrial Customer Alliance (PPLICA)[1] appeals from an order of the

---

**1.** PPLICA is an ad hoc association of commercial and industrial customers in Pennsylvania Power & Light's (PP & L) service territory. The members of this association for purposes of this appeal are companies that purchase distribution service and/or genera-

tion supply service from PP & L and include the following: Air Products and Chemicals, Inc., Alcoa, Armstrong World Industries, Inc., Binkley & Ober, Inc., Chamberline Manufacturing Corporation, Empire Kosher Poultry, Inc., Hercules Cement Company, La-

Pennsylvania Public Utility Commission (PUC) dismissing its petition requesting a declaratory order prohibiting the implementation of a tariff interpretation change to PP & L's billing method for customers who purchase generation supply from another electric generation supplier and an order denying its request for reconsideration.

Historically, electric utilities in Pennsylvania provided three services to customers: the generation, transmission and distribution of electricity. These "bundled" services were performed by one local utility that held a monopoly over its service area. However, to encourage a competitive wholesale electric market and provide cost savings to consumers, in December 1996, the Electricity Generation Customer Choice and Competition Act (Competition Act) was enacted.[2] This Act "unbundled" or separated the three traditional functions and allowed Pennsylvania residents to choose to purchase their electricity from other in-state or out-of-state electric generation suppliers (EGS) who would generate and sell electricity directly to the consumers. If the consumers chose to purchase their electricity from another supplier other than the local utility, the local utility, also referred to as an electric distribution company (EDC), still remained responsible for the transmission and distribution of the electricity.

Each Pennsylvania EDC was required to file a Restructuring Plan (Plan) to implement the Competition Act pursuant to 66 Pa.C.S. § 2806(d).[3] PP & L proposed in its Plan that customers would not be able to obtain distribution service from other EGSs. PP & L filed its Plan and PPLICA filed a complaint against that Plan. After hearings on the matter, the PUC issued a final order substantially modifying the Plan by finding that it was anti-competitive and discriminated against customers who shopped for alternative supply from EGSs. PPLICA filed an action with this Court requesting us to review the Restructuring Order, but subsequent to the filing of the appeal, the parties and the PUC entered into a Joint Petition for Full Settlement of PP & L, Inc.'s Restructuring Plan and Related Court Proceedings (Settlement Agreement) to resolve the outstanding issues. Paragraph G.5.b of the Settlement Agreement, the only provision of the Settlement Agreement relevant to this action, involves Rate Schedules IS–P and IS–T pertaining to the distribution of electricity by PP & L, which were among the many tariff provisions included in the Settlement Agreement. Paragraph G.5.b provides:

G.5.b.   PP & L shall unbundle the rate components of rate schedules IS–P and IS–T in a fashion that will allow a customer to obtain generation supply from a competitive supplier without penalty and in a nondiscriminatory fashion. Any discount or credit applied to the delivery service component of the rates will be portable and shall apply on a comparable basis whether or not a customer chooses to obtain generation supply from a competitive supplier.

farge Corporation, Magee Rieter Automotive Systems, Mount Joy Wire Corporation, Praxair, Inc., RR Donnelley & Sons Company, Inc., and Thomson Consumer Electronics.

2.   66 Pa.C.S. §§ 2801–2812.

3.   66 Pa.C.S. § 2806(d) provides:

All electric utilities in this Commonwealth shall submit to the commission, pursuant to a schedule to be determined by the commission in consultation with the electric utilities, beginning on April 1, 1997, but in no event later than September 30, 1997, a restructuring plan to implement direct access to a competitive market for the generation of electricity.

Rate Schedule IS–T (Interruptible Service—Transmission) and Rate Schedule IS–P (Interruptible Service—Primary) services are interruptible distribution services which are available with at least 1,000 kilowatt (kW) of year-round interruptible power to customers who contract to accept interruptible service for at least one year. Under both of these rate schedules, eligible customers can purchase interruptible distribution service which means that PP & L can request the customer to curtail electricity usage "as required for economic load control, for system and local emergencies, and for tests of the customer's ability and readiness to interrupt load during an emergency."[4] While the customer is required to interrupt during emergencies and emergency tests, the customer has the option to interrupt or accept an additional charge for continued use during periods of economic load control. There is an additional charge for failure to interrupt during an emergency or an emergency test interruption period of $24.95 per kW for all kW, by which the

maximum 15 minute demand for the period of requested interruption exceeds the Firm Power,[5] i.e., the level of kW demand which the customer has no obligation to curtail during an interruption of service called for by the local utility. The local utility has the option of canceling the contract for interruptible service if the customer fails to interrupt during an emergency or an emergency test interruption period. Additional charges included in these Rate Schedules are Competitive Transition Charges (CTC) and Intangible Transition Charges (CTC).

In 1998, PP & L devised a billing method for Rate Schedule IS–P and IS–T customers who purchased some or all of their electric generation service from another supplier but failed to curtail usage equivalent to its provided interruptible portion of the total load during a system emergency interruption. The method was based on an allocation of the customer's prior firm power level for the portion of supply taken from PP & L.[6] It also specified how it

4. The tariff further provides:

   The frequency of load interruptions shall be no more than 15 per calendar year with such interruptions being no more than 1 hour in any one day; nor more often than five days in any single month; or more than 150 hours in a calendar year. No more than 5 of these load interruptions and 50 hours of interruptions may be for economic load control.

5. "Firm Power" is defined under both tariffs as:

   Firm Power is the level of kW demand which the customer has no obligation to curtail during an interruption of service called by the Company. The initial level of Firm Power shall be specified in the contract. This initial level will be adjusted by the Company to the level of Firm Power actually achieved by the customer during an emergency or an emergency test interruption period. The adjusted level shall become the level of Firm Power for the

   remaining term of the contract or until a new level of Firm Power is achieved during a subsequent emergency or an emergency test interruption period. The level of Firm Power shall not be adjusted below the initial level of Firm Power specified in the contract.

6. The billing method was as follows:

   In order to monitor the customer's performance *relative to that portion of its load supplied by PP & L,* PP & L will calculate for each customer a new "required load level" against which customer actions will be measured... (Emphasis added).
   ● Calculate the customer's on-peak demand using the PJM methodology. [PJM is the company that ensures electric system reliability and has in place procedures that it implements when anticipated customer demand exceeds the available generation resources in its area. During an emergency, PJM takes various actions to attempt to ensure that firm supply customers do not experience a blackout or other

would calculate penalties for non-compliance.[7] PPLICA understood this to mean that PP & L would calculate penalties based only on the portion of the generation supply provided by an EGS that the customer was obligated to interrupt for PP & L during the system emergency or that portion of the interruptible supply actually purchased from PP & L. Throughout most of 1999, this billing method was utilized; however, in October 1999, PP & L decided to modify this method as it applied to those customers who purchased all of their generation supply from an EGS and notified customers on Rate Schedules IS–P and IS–T of this modification stating the following:

> The final point of discussion concerns PP & L's plans for billing customers on the IS–P and IS–T Rate Schedules who shop for the generation and transmission from an EGS in the year 2000 and thereafter. PP & L responded that it intends to bill such customers in accordance with its tariff, applying the formula for billing kW to each component of service that the Company provides. In the case of shoppers, the Company will apply formula to Distribution, Competitive Transition Charge, and Intangible

Transition Charge. Because we understand that there is some confusion among customers and EGSs on this point, PP & L will, shortly, send a letter to each of its interruptible customers that calls their attention to this tariff language.

On December 23, 1999, PP & L mailed to its IS–P and IS–T customers a letter explaining its proposed implementation of changes in rate schedules for customers who obtained 100% of their generation from an EGS after January 2, 2000. In response to whether an IS–P or IS–T Rate Schedule customer could buy firm power from an EGS, PP & L explained in the letter:

> Yes, customers can buy firm power from an EGS. Customers can also buy from an EGS interruptible power to a firm level that is different than your PP & L, Inc. firm level, or interruptible power with a different number of calls or different response requirements. You should be aware, however, that PP & L's delivery service tariff requires PP & L to reflect your actual performance during emergency interruptions. For example, operating during an emergency

---

> types of degradation of service.] Assume that for the hypothetical customer, this value is 10,000 kW.
> - Of the 10,000 kW, PP & L's supply will be the pro rata share. From the previous example, 35%, or 3,500 kW, would be PP & L's total supply, with a 700 kW firm. The supply by the EGS would be 6,5000 kW.
> - At the time of an emergency interruption, PP & L would expect to see a total customer load during the period of interruption of no more than 7,2000 kW (the 6,5000 kW EGS supply plus the 700kW of firm PP & L supply). This load level would demonstrate compliance relative to PP & L's portion of the supply. If the customer purchased interruptible energy from its EGS, the customer's load during an interruption will likely be below

> 7,2000 kW. PP & L will use 7,2000 kW as the customer's performance for compliance purposes relative to PP & L's supply.

7. Penalties were calculated as follows:

> For non-compliance, the contract firm would be ratcheted pursuant to Tariff 201 and penalties would be calculated under the tariff. PP & L's pro rata firm supply kW would be increased by the same amount, as would the "required load level." Assume that our hypothetical customer reduces to only 8,000 kW. This means that the customer has failed to provide PP & L with 800 kW of interruptibility (8,000 kW— 7,2000 kW = 800 kW). PP & L's portion of the pro rata firm load is now 1,500 kW (700 kW ⇐ 800 kW), and the "required load level" is 8,000 kW (7,200 kW ⇐ 800 kW).

interruption above your PP & L, Inc. contract firm (or ratcheted firm) will increase your Billing Demand and will result in higher delivery charges from PP & L, Inc. for Distribution, Competitive Transition Charge (CTC), and Intangible Transition Charge (ITC) for both shopping and non-shopping customers. Operating during an emergency will also subject both shopping and non-shopping customers to additional charges specified in PP & L's tariff.

While all of PPLICA's members purchased 100% of their distribution service from PP & L, because some of its members were currently negotiating contracts with EGSs to totally replace PP & L as their generation and transmission supplier, or they entered into contracts with EGSs for generation supply that extended beyond January 2000, PPLICA filed with the PUC a petition seeking a declaratory order or, in the alternative, a complaint prohibiting the implementation of what it perceived to be a tariff interpretation change by PP & L regarding the electric distribution service it provided to some of its customers pursuant to Rate Schedules IS-P and IS-T. It alleged that PP & L was changing the billing method so that customers on those Rate Schedules paid higher distribution rates for service that was of a lesser quality in violation of the Competition Act because it was interruptible than similar customers on firm uninterruptible rate schedules, and IS-P and IS-T customers could not use PP & L's distribution service at times when customers on the firm rate schedules were permitted to use the distribution system. Further, because PP & L was only providing distribution service to customers, it was unreasonable to apply the penalty provisions to those customers when a generation—related emergency existed and they failed to interrupt service pursuant to PP & L's Rate Schedules. Specifically, it argued that a

customer's contract with the EGS included penalties when the customer failed to curtail usage during an interruption request, but under the tariff, customers would also be penalized by PP & L so that both the supplier and distributor would penalize the customer. Thus, a customer who purchased supply from PP & L would only face· one penalty as opposed to two. PPLICA argued that effective January 1, 2000, the change in PP & L's billing method resulted in the following modifications:

- Customers would no longer be permitted to freely contract for electric generation supply from a competitive EGS unless that supply was interruptible to the same extent and at the· same times as electricity supply that PP & L provided to the same customer;

- PP & L could control the usage of the competitively procured supply by requiring curtailment during a PJM emergency; and

- To the extent an IS–P or IS–T customer that contracted with an EGS for competitive supply did not curtail usage during a generation emergency interruption event requested by PJM to the exact level that PP & L would require curtailment if the customer purchased supply from PP & L, PP & L could impose a five-fold penalty on the customer by increasing distribution charges, increasing competitive transition charges, increasing intangible transition charges, charging a $24.95 per kW penalty and eviction from the rate schedule.

PPLICA also filed a petition for an emergency order requesting an immediate order preventing the implementation of the proposed billing modification to the subject Rate Schedules. The PUC denied the petition for emergency order and as-

signed the matter to an Administrative Law Judge (ALJ) for hearing.

Before the ALJ, PPLICA argued that Rate Schedules IS–P and IS–T were ambiguous and required the PUC to consider extrinsic evidence because the usage of the words "load" and "power" in those Rate Schedules would only be applied if the customer received generation supply service from PP & L. More specifically, PPLICA contended that if the plain meaning of "load" was generation supply, then the tariffs provided PP & L with authority to request interruption only of generation supply from PP & L. If a customer received generation supply from an EGS, PP & L was without power to request the customer to curtail usage during an emergency interruption or to impose penalties. PPLICA also argued that PP & L changed its interpretation of the Rate Schedules and that change was relevant to the PUC's interpretation of the tariff. PPLICA further argued that the rates, terms and conditions contained in Rate Schedules IS–P and IS–T were based on PP & L's cost of distribution service allocable to customers, and that the unbundled CTC and ITC charges reflected the proper allocation of stranded costs to customers as determined by the PUC in the restructuring proceeding and Settlement Agreement. Finally, PPLICA argued that PP & L's proposed changes had an anti-competitive effect because they would detrimentally impact the ability of customers to request service from competitive suppliers and interfere with decisions between customers and EGSs regarding the level of interruptibility of service.

The ALJ recommended that the PUC deny PPLICA's request for a declaratory order and dismiss the complaint because PPLICA failed to present any evidence to show that any specific portion of the Rate Schedules' text was ambiguous or susceptible to multiple meanings. Further, the words "load" and "power" in the Rate Schedules did not only apply to PP & L generation. Additionally, although PP & L admittedly changed its billing procedure from 1999 to 2000, and that constituted a changed interpretation of tariffs IS–P and IS–T, the change was not relevant to the issue of tariff interpretation. "After, all, the real question in this proceeding is whether PP & L has (or should have) any control over the interruptibility of the generation it did not sell to the industrial customer who is legally free under the Competition Act to shop for all of its energy needs with a competitive supplier under free and open market conditions." (ALJ's March 31, 2000 decision at p. 11). Additionally, the ALJ found that the Rate Schedules were based on costs of service principles and did not result in an anti-competitive intent or effect. Finally, the ALJ determined that the rate schedules promoted the availability of interruptibility of EGS supplied firm energy distributed under an interruptible rate schedule which, in turn, strengthened the PJM system reliability. PPLICA filed exceptions to the ALJ's recommended decision.

The PUC adopted the ALJ's recommended decision finding that although PPLICA argued that the ALJ failed to decide whether PP & L should have the ability to exercise control and require interruption of supply procured by an IS–P or IS–T customer from a competitive supplier, that argument was without merit because the Rate Schedules were included in PP & L's Settlement Agreement, which the PUC had previously approved and to which PPLICA was a signatory, and the language in the tariffs had not changed. The PUC also noted that "[t]he fact that PP & L adopted a modified billing approach for 1999 is of no consequence to the germane issue in this proceeding; that is,

whether PP & L's interpretation of Rate Schedules IS–P and IS–T complies with the terms and conditions of the tariffs as approved by the Commission." Ultimately, the PUC determined that PP & L could require IS–P and IS–T customers to curtail load during system emergencies and allowing customers to avoid an obligation to curtail load during emergencies would not promote system reliability. The PUC then dismissed the exceptions along with PPLICA's request for a declaratory order and complaint. PPLICA filed a request for reconsideration which was denied and this appeal followed.[8]

## I.

PPLICA contends that the PUC erred in adopting PP & L's interpretation of the tariffs because that interpretation is in violation of the Competition Act. It contends that the PUC's interpretation of the tariff allowing PP & L to impose higher charges on Interruptible Customers for Distribution, Competitive Transition Charges and Intangible Transition Charges is not in accord with Section 2804(2) of the Competition Act, 66 Pa.C.S. § 2804(2), which provides that customers are allowed to choose an electric supplier through direct access and "[c]ustomers should be able to choose among alternatives such as firm and interruptible service, flexible pricing and alternative generation sources ..." It also directs our attention to the Settlement Agreement in which IS–P and IS–T customers were guaranteed the ability to access competitive supply alternatives without penalty or

discrimination. It then explains that in 1999, PP & L implemented the tariff provisions attached to the Settlement Agreement in a manner that did not obligate an IS–P or IS–T customer obtaining competitive supply to interrupt distribution service for that supply during a PJM emergency and did not penalize the customer for continuing usage of competitively procured supply, thereby evidencing the intent of the parties when the Settlement Agreement was entered.

■ As the PUC correctly found, the Rate Schedules were included in PP & L's Settlement Agreement which the PUC had previously approved, PPLICA was a signatory to the Settlement Agreement, and the language in the tariffs has not changed. That means that the PUC reviewed and approved the discounts contained in the interruptible service rates when PP & L's interruptible service rate schedules were unbundled in the restructuring proceeding. Consequently, PP & L's interpretation of the tariffs was not contrary to the Settlement Agreement and not in violation of the Competition Act.

■ As to PPLICA's contention that rate changes were to occur in 2000 that did not occur in 1999, PP & L explained that the method of billing was changed but was due to the fact that 1999 was a temporary transition period and that it was essentially waiving certain charges during the phase-in period of customer choice. The PUC concluded that PP & L did not waive any provisions of the Rate Schedules for periods after the 1999 transition year, and

---

8. Our scope of review of the PUC's decision is limited to determining whether constitutional rights have been violated, an error of law committed, or whether the PUC's findings and conclusions are supported by substantial evidence. *Montour Trail Council v. Pennsylvania Public Utility Commission*, 547 Pa. 367, 690 A.2d 703 (1997). Were PPLICA only

appealing from the denial of reconsideration, our scope of review would be whether the PUC abused its discretion. *Popowsky v. Pennsylvania Public Utility Commission*, 676 A.2d 731 ft.7 (Pa.Cmwlth.1996); *J.A.M. Cab Company, Inc. v. Pennsylvania Public Utility Commission*, 132 Pa.Cmwlth. 390, 572 A.2d 1317 (1990).

the procedures adopted by PP & L for 1999 did not allow customers on the interruptible service rate schedules to avoid emergency interruptions in the future.[9] Despite the fact that PPLICA believes a rate change occurred, it is the PUC's interpretation of the Rate Schedules which controls. *Jackson v. Pennsylvania Public Utility Commission,* 105 Pa.Cmwlth. 37, 522 A.2d 1187, *petition for allowance of appeal denied,* 517 Pa. 611, 536 A.2d 1335 (1987). Here, the PUC properly found that the rate change did not affect the terms and conditions of those schedules. Because an administrative agency is entitled to substantial deference in construing documents that are within its particular expertise, such as tariffs, *Chappell v. Pennsylvania Public Utility Commission,* 57 Pa.Cmwlth. 17, 425 A.2d 873 (1981), the PUC's determination will not be disturbed.

## II.

■ PPLICA's main argument, though, is that the PUC's tariff interpretation violates the Competition Act because PP & L is being permitted to discriminate against customers who obtain generation supply from EGSs.[10] It explains that an IS–P or IS–T customer that contracted with an EGS for firm or less interruptible generation supply is now forced to make a choice between curtailing usage to the PP & L firm power level during a PJM emergency

interruption or continuing usage at the level contracted with the EGS and paying additional distribution, CTC and ITC charges to PP & L, thereby being deprived of the benefits of its contract with the EGS. Because the industry has been de-regulated and its members have bought firm power from an EGS, PPLICA contends they should not be penalized if delivery of EGS power continues during a period when PP & L needs to interrupt supply because they have not caused the interruption as they have bought firm EGS power. If this is allowed to occur, PPLICA argues that there is then no reason for its members to buy "firm" EGS power because they would always be treated as "interruptible" customers by PP & L and they would have to pay higher rates when that power was delivered. In other words, it is contending that the PUC is applying pre-deregulation principles because firm and interruptible power concepts go to insufficient power being generated by the regulated utility, not that the utility is unable to deliver power, and customers are unnecessarily discriminated against because they are assessed higher rates and penalties on competitively procured supply.

The PUC did not directly address PPLICA's argument, but instead found that interruptible service was needed to preserve system reliability.[11] Even though de-regu-

---

9. PPLICA also argues that the PUC's order results in an impermissible shift of stranded costs responsibility between customer classes in violation of the Competition Act because application of the CTC and ITC charges will unreasonably increase the stranded cost responsibility and charges for IS–P and IS–T customers that obtain firm or less interruptible generation supply from an EGS. As we have already noted, the Settlement Agreement as part of the Restructuring Proceeding, was approved by the PUC and included in that Settlement Agreement was the provision that stranded costs were recovered through the CTC and ITC. The PUC determined that the

methodology under which PP & L recovered the charges did not shift between classes. Consequently, PP & L's contention is erroneous.

10. Stating this argument another way, PPLICA also argues that the PUC exceeded its jurisdiction by interfering with the unbundled generation supply function.

11. The PUC determined that while customers who choose interruptible service may have to pay higher distribution rates and penalties if they fail to interrupt, they also pay substantially discounted rates for that service and pay

lation would not be fostered if a customer was, in effect, penalized by buying firm power on the open market, the PUC found that allowing PP & L, as the distributor, to have control over the interruptibility of its supply purchased from an EGS was needed because, "[t]o allow interruptible service customers to avoid an obligation to curtail load during emergencies would, at this juncture of Electric Competition, defy our efforts to promote system reliability considerations." In effect, what the PUC found was that all power on the grid (the PJM), no matter where bought and no matter firm or not, was always subject to interruption for system reliability.

PPLICA's argument that it should not be penalized because it has purchased firm power and should not be forced to curtail usage "encouraged" by increased distribution rates and penalties and not by any shortage of capacity to distribute the power, shows one of the seams in the deregulatory scheme. While every customer, as envisioned under that scheme, should be able to shop for the lowest rate and highest quality of service, there has to be some mechanism so that there is overall system reliability for all customers on the grid.

Prior to de-regulation, there only existed one entity that could be charged with overseeing the interruptibility of service—the local utility that originally provided supply, transmission and distribution of service. However, since de-regulation, some mechanism has to be in place so that during

periods of peak demand, there are no brownouts or blackouts on the system. While PPLICA is essentially questioning the "fairness" of allowing a distributor of supply such as PP & L to control the interruptibility of the service, only the distributor is in position to enhance system reliability because of the myriad of generators and transmission companies that place power in a particular distribution grid. To allow shopping customers to receive discounted rates under the interruptible service rate schedules but disregard PP & L's calls for emergency interruptions would jeopardize the reliability of service because shopping customers would purchase firm electric supplies from EGSs because there would be no incentive for them of reducing power during times of peak capacity.

■ While it cannot, under the mantra of system reliability, re-regulate the industry by favoring the distribution company, thereby thwarting the goals of the Competition Act, the PUC can, as long it provides substantial reasons why there is no reasonable alternative so competition needs to bend to ensure overall system reliability, order customers by whatever scheme to curtail usage during abnormal peaks. Because the PUC has adequately explained its decision based on substantial evidence [12] and is entitled to substantial deference, *Popowsky v. Pennsylvania Public Utility*, 550 Pa. 449, 706 A.2d 1197 (1997), the PUC's determination will not be dis-

lower competitive transition charges and intangible transition charges than those charged to firm customers. PP & L provided evidence that the total savings to interruptible service customers during 1999 was approximately $41 million and the discounts realized by PPLICA members during 1999 was approximately $25 million.

12. While PPLICA also contends that the PUC issued an order that lacks the necessary speci-

ficity for this Court to conduct an effective appellate review because it failed to address in detail its conclusion that the record was devoid of any credible evidence that PP & L's Rate Schedules were anti-competitive or discriminatory, in the above reasons, the PUC adequately explained its reasons for finding that PP & L's Rate Schedules were not discriminatory or anti-competitive.

turbed.[13]

Accordingly, the decision of the PUC dismissing PPLICA's petition, complaint and exceptions is affirmed as is its order denying reconsideration.

### ORDER

AND NOW, this *10th* day of *July*, 2001, the orders of the Pennsylvania Public Utility Commission, dated June 5, 2000 and July 20, 2000, are affirmed.

**13.** PPLICA also argues that the PUC erred by failing to base its decision on substantial evidence because the testimony of witnesses it offered stated that their competitive options will be reduced as a result of the PUC's adoption of PP & L's tariff interpretation. However, the PUC found that there was no evidence that PP & L applied the tariffs differently to shopping customers than it did to PP & L distribution customers or that the tariffs were applied in a manner inconsistent with the language in the tariffs. Because the PUC is the ultimate factfinder and makes all determinations as to the weight and credibility of evidence, *Borough of Duncannon v. Pennsylvania Public Utility Commission*, 713 A.2d 737 (Pa.Cmwlth.1998), we will not disturb its determination.