COALITION FOR AFFORDABLE UTILITY SERVICES AND ENERGY EFFICIENCY IN PENNSYLVANIA; the Tenant Union Representative Network and Action Alliance of Senior Citizens of Greater Philadelphia, Petitioners

v.

PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.

Tanya J. McCloskey, Acting Consumer Advocate, Petitioner

v.

Pennsylvania Public Utility Commission, Respondent.

Commonwealth Court of Pennsylvania.

Argued March 11, 2015.
Decided July 14, 2015.

Robert W. Ballenger, Philadelphia, Harry S. Geller, Harrisburg, Elizabeth R. Marx, Harrisburg, and Thu B. Tran, Philadelphia, for petitioners.

Christy M. Appleby, Harrisburg, for intervenor Office of Consumer Advocate.

Deanne M. O'Dell, Harrisburg, for intervenor Direct Energy Services, LLC.

James A. Mullins, Assistant Counsel, Harrisburg, for respondent.

BEFORE: DAN PELLEGRINI, President Judge, BERNARD L. McGINLEY, Judge, RENÉE COHN JUBELIRER, Judge, MARY HANNAH LEAVITT, Judge, P. KEVIN BROBSON, Judge, PATRICIA A. McCULLOUGH, Judge, and ANNE E. COVEY, Judge.

OPINION BY Judge P. KEVIN BROBSON.

Petitioners, all of whom advocate on behalf of consumers affected by the Customer Assistance Program (CAP) of PECO Energy Company (PECO),[1] appeal two orders entered by Respondent the Pennsylvania Public Utility Commission (PUC). In those two orders, the PUC approved in part a PECO plan, called the CAP Shopping Plan, which would allow PECO's CAP customers to shop for and choose their electric generation supplier (EGS). The PUC approved the PECO plan only in part, because it rejected a condition proposed by PECO that would require EGSs that wish to enroll PECO CAP customers to charge a generation supply rate equal to or below PECO's residential price-to-compare (PTC). The PUC also rejected a proposal by the OCA to prohibit EGSs who enroll PECO CAP participants from imposing cancellation or termination fees on those participants. For the reasons set forth below, we affirm the PUC's decision to reject PECO's proposal to impose a ceiling on the rate an EGS may charge a CAP participant for electricity supply. We reverse, however, the PUC's rejection of the OCA's proposal to prohibit early cancellation/termination fees.

## I. BACKGROUND

PECO is an electric distribution company (EDC), as defined by the Electricity Generation Customer Choice and Competition Act (Choice Act), 66 Pa.C.S. §§ 2801–2815,[2] delivering electricity to retail customers in southeastern Pennsylvania, inclusive of the City of Philadelphia. The orders currently on appeal arise out of a proceeding initiated by PECO before the PUC on January 13, 2012, when PECO filed with the PUC a request for approval of PECO's Default Service Program for the period from June 1, 2013, to May 31, 2014 (DSP II). Through DSP II, PECO proposed a plan to fulfill its statutory obligation to provide default electric generation service to its customers who do not choose an alternative energy supplier or whose contracted EGS fails to supply the electric service. See 66 Pa.C.S. §§ 2803 (defining "default service provider"), 2807(e).

In an opinion and order entered on October 12, 2012, the PUC approved DSP II in part (DSP II Decision). Relevant to this appeal, in its DSP II Decision the PUC directed PECO to develop a plan

---

1. By Order dated May 6, 2014, this Court consolidated the separate appeals docketed at 445 C.D. 2014 and 596 C.D. 2014. Petitioners include the Coalition for Affordable Utility Service and Energy Efficiency in Pennsylvania (CAUSE–PA), the Tenant Union Representative Network and Action Alliance of Senior Citizens of Greater Philadelphia (collectively, TURN), and the Pennsylvania Office of Consumer Advocate (OCA).

2. The Choice Act is part of the Public Utility Code (Code), 66 Pa.C.S. §§ 101–3316. Section 2803 of the Choice Act defines "electric distribution company" as follows:

The public utility providing facilities for the jurisdictional transmission and distribution of electricity to retail customers, except building or facility owners/operators that manage the internal distribution system serving such building or facility and that supply electric power and other related electric power services to occupants of the building or facility.

66 Pa.C.S. § 2803.

that would allow PECO's CAP customers to choose their EGS. (Reproduced Record (R.R.) 52a.) With respect to non-CAP customers, the PUC approved PECO's Standard Offer Customer Referral Program (Standard Offer Program). Under this program, residential customers who have not selected an EGS on their own could request that PECO assign them to an EGS that participates in the Standard Offer Program. To participate in PECO's Standard Offer Program, an EGS must agree to supply electricity to referred PECO customers at a fixed rate of at least 7% below PECO's PTC[3] at the time of customer enrollment for a term of 12 months. The customer may cancel at any time.[4] (R.R. 36a–42a.)

At the time it issued its DSP II Decision, the PUC was considering PECO's Universal Service and Energy Conservation Plan (Universal Service Plan) for 2013–2015. A utility's universal service and energy conservation plan or program sets forth how the public utility proposes to serve low-income customers[5] in a manner that allows those customers to maintain electric service. 66 Pa.C.S. § 2803. To meet this mandate, an EDC must include in its universal service and energy conservation plan a CAP. *Id.;* 52 Pa.Code §§ 69.261–.267; *see also* 66 Pa.C.S. § 1403 (defining "customer assistance program"). Under a CAP, the low-income customer agrees to pay a monthly amount for electric service based on household size and income, which may be less than the actual

amount billed by the EDC, in return for the continued provision of electric service. 66 Pa.C.S. § 1403; 52 Pa.Code § 54.72. Under the Choice Act, the PUC is required to ensure that these programs and policies continue, are adequately funded, and are available in every electric service territory. 66 Pa.C.S. §§ 2802(10), (17), 2804(9). The PUC has promulgated regulations to implement this statutory duty. *See* 52 Pa.Code §§ 54.71–.78.

Implementation of a CAP comes at a cost to the EDC. While the EGS receives payment in full from the EDC for the contracted supply, the CAP customers only pay the EDC the amount they are required to pay under the CAP in order to maintain service. The difference between the amount EDCs bill CAP customers for service and the amount CAP customers actually pay the EDC for service is referred to as the "CAP shortfall" or "CAP discount." Under PECO's CAP Program, PECO recovers the bulk of the CAP discounts from its non-CAP residential customers through (a) base rates and (b) a universal service fund charge (USFC). In practice, the wider the gap between the billed amount and the amount paid by the CAP customers, the greater the financial burden placed on non-CAP customers, from whom PECO recovers the CAP discounts. In 2013, non-CAP customers absorbed approximately $82.3 million in PECO CAP costs through base rates and another $15.7 million through the USFC.[6]

---

**3.** PTC is the amount, or rate, that an EDC charges a retail customer who has not selected an EGS for electric generation supply— *i.e.,* for default service. 52 Pa.Code § 54.182.

**4.** Should a customer cancel service under the Standard Offer Program, the customer either selects an alternative EGS to provide supply or returns to PECO's default service PTC.

**5.** The PUC defines "low[-]income customers" as "[a] residential utility customer whose an-

nual household gross income is at or below 150% of the Federal poverty income guidelines." 52 Pa.Code § 69.262.

**6.** *Opinion and Order Re: Petition of PECO Energy Co. for Approval of its Default Service Plan,* PUC Docket No. P–2012–2283641, at 4–5 (Entered Jan. 24, 2014), attached as Appendix A to OCA's Definitive Form Brief.

In an opinion and order entered April 4, 2013 (PUC Docket No. M 2012–2290911), the PUC approved in part PECO's Universal Service Plan for 2013–2015, and directed PECO, *inter alia*, to file an amended Universal Service Plan within thirty days. In that decision, the PUC noted its October 12, 2012, decision with respect to DSP II and, specifically, its directive to PECO to submit a plan under the DSP II docket to allow for CAP shopping.

PECO filed for PUC approval of its CAP Shopping Plan under the DSP II docket on May 1, 2013 (CAP Shopping Petition). The plan proposed by PECO has many elements. Relevant for our purposes is PECO's proposal with respect to the participation of EGSs in PECO's CAP. Under the PECO proposal, an EGS that wishes to serve PECO's CAP customers would need to submit to PECO a notice of intent to participate as a CAP supplier and must agree to charge a rate for electricity supply to CAP customers that is at or below PECO's PTC—*i.e.*, a "price ceiling." The PECO proposal otherwise allowed EGSs to structure their arrangements consistent with their business goals and interests, including, *inter alia*, imposing contract lengths and termination fees. PECO proposed various measures to simplify the shopping process for CAP customers. It also prohibited EGSs from discriminating among CAP customers. As part of the program, PECO proposed customer education initiatives to encourage CAP participants to shop for their EGS.

The Petitioners filed answers to the CAP Shopping Petition. Several EGSs also participated in the proceedings before the PUC on PECO's CAP Shopping Petition, including Intervenor Direct Energy, LLC (Direct Energy); *Amicus Curiae* FirstEnergy Solutions Corp. (FirstEnergy); and Interstate Gas Supply. The

Pennsylvania Office of Small Business Advocate also participated. The matter was assigned to an Administrative Law Judge (ALJ). Following the submission of prehearing filings, the ALJ conducted a hearing on PECO's CAP Shopping Petition on July 11, 2013. Final post-hearing briefs were filed on August 9, 2013, and the ALJ certified the record to the PUC for disposition on August 13, 2013.

On January 24, 2014, the PUC entered the first of the two opinions and orders that are the subject of this consolidated appeal. That first order approved in part PECO's proposal in its CAP Shopping Petition (Approval Order).[7] Based on the issues on appeal, we focus on only two dispositions by the PUC in that determination. The first relates to PECO's proposal for an EGS price ceiling. The second relates to OCA's recommendation that. EGSs choosing to participate in the CAP Shopping Plan be prohibited from imposing cancellation or termination fees. PECO's proposal, as noted above, expressly allows EGSs to impose such fees should they choose to do so.

Adopting the position of the EGSs, the PUC disapproved PECO's price ceiling proposal, reasoning:

> We concur with Direct Energy that there is nothing in the Electric [Choice] Act that gives the [PUC] the authority to limit prices charged by the EGSs. Accordingly, we reject PECO's proposal to impose a limit on the shopping price for CAP customers at or below PECO's prevailing PTC. By removing the barrier to customer choice and allowing CAP customers the freedom to choose their EGS, as contemplated by the Electric [Choice] Act, we are affording PECO's CAP customers the same opportunities

---

7. *See supra* note 6.

and benefits currently available to every other PECO customer.

PECO's proposal to limit CAP shopping prices to PECO's prevailing PTC would require EGSs to offer products that may be subject to change in response to quarterly changes in PECO's PTC. Consequently, we are persuaded by the comments of the EGSs in this proceeding that PECO's proposed ceiling on CAP shopping rates would, *inter alia:* (1) limit the diversity of shopping programs available to CAP customers; (2) impose a higher level of risk for EGSs that would likely translate into higher prices for CAP customers; and (3) potentially cause unnecessary customer confusion with potentially frequent addendums to customer contracts.

As discussed, *supra,* the CAP Shopping Petition states that the Company will implement a variety of customer education initiatives for low[-]income customers focused on the benefits of the competitive electricity market and the promotion of shopping for electricity. PECO states that these initiatives would also inform CAP customers of tools to help them understand and manage their energy bills. CAP Shopping Petition at 8. While we are rejecting PECO's proposal to establish a ceiling on CAP shopping prices, we believe that a clear and effective customer education program will create an environment where PECO CAP customers will actively seek shopping opportunities that could provide them savings or additional benefits over continuing to receive default service from PECO.

(Approval Order at 14–15.) In summary, then, the PUC rejected the price ceiling component of the PECO proposal for three reasons: (1) the PUC lacked authority to impose the ceiling under the Choice Act; (2) the proposed price ceiling would not be in the best interest of CAP participants; and (3) PECO's proposed customer education program will ensure that CAP participants benefit from the opportunity to shop for their EGS.[8]

With respect to OCA's recommendation to prohibit EGSs from charging early termination and cancellation fees, the PUC, again adopting the stance of the EGSs on the subject, rejected OCA's proposal:

We concur with Direct Energy that prohibiting early termination or switching fees would install a higher level of risk for EGSs that could likely translate into higher shopping prices for PECO CAP customers or a lack of participation by EGSs in PECO's CAP shopping market. We are also of the opinion that, just as with pricing limitations, we lack the legal authority to prohibit EGSs from charging early termination or switching fees. Therefore, we reject OCA's proposal to add a prohibition of termination or cancelation [sic] fees to PECO's CAP Shopping Plan. Accordingly, we agree that EGSs, if allowed by the terms of the contract, should be able to charge termination fees or recoup incentives provided to CAP shopping customers if a customer switches to another supplier or otherwise terminates the contract with the EGS prior to the expiration of the contract.

(*Id.* at 16–17.) Accordingly, the PUC rejected the OCA proposal for the following reasons: (1) imposing such a limitation could lead to higher shopping prices for CAP participants and/or fewer EGSs willing to provide service to CAP participants; and (2) as was the case with PECO's price

---

8. Commissioner Gladys M. Brown filed a partial dissent, embracing PECO's proposal to impose a price ceiling.

ceiling proposal, the PUC lacks the legal authority to prohibit EGSs from charging such fees.

Though not directly challenged on appeal, we note here a third component of the PECO proposal, which the PUC rejected. (*Id.* at 27–28.) In its earlier DSP II Decision, in addition to directing PECO to develop its CAP Shopping Plan, the PUC directed its Office of Competitive Market Oversight to work with PECO to "ensure that, to the extent possible, the ... Standard Offer Programs are available to CAP customers." (R.R. 52a.) In its CAP Shopping Plan proposal, however, PECO cited incompatibilities between its Standard Offer Program and its CAP Shopping Plan. As noted above, the PECO Standard Offer Program requires that a participating EGS provide a fixed rate for 12 months at or below 7% of PECO's PTC *at the time of customer enrollment.* PECO's CAP Shopping Plan proposal, however, would require EGSs, through the duration of the contract with the CAP participant, to never charge the CAP participant a rate in excess of PECO's PTC—*i.e.,* the price ceiling. To implement PECO CAP Shopping Plan price ceiling, participating EGSs would have to track changes in PECO's PTC during the duration of a contract with a CAP participant. Because the Standard Offer Program price ceiling only applies at the time of customer enrollment, there is no similar tracking requirement in the Standard Offer Program. Preferring the rate ceiling structure in its CAP Shopping Plan over the rate ceiling structure of its Standard Offer Program, PECO declined to extend the Standard Offer Program to CAP customers.

Because the PUC rejected the price ceiling component of PECO's CAP Shopping Plan, it found no justification for refusing to open the Standard Offer Program to CAP participants. The PUC, therefore, directed PECO to allow interested CAP customers to avail themselves of the Standard Offer Program. Petitioners do not challenge this portion of the PUC Approval Order on appeal. Nonetheless, as explained below, it colors our analysis of the issues before us.

Petitioners and PECO sought reconsideration and/or clarification of the Approval Order. By Opinion and Order entered February 20, 2014, the PUC agreed to reconsider its Approval Order. By Opinion and Order entered on March 12, 2014, the PUC granted in part and denied in part the requests for reconsideration (Reconsideration Order).[9] The PUC considered again, *inter alia,* the parties' positions relative to the PECO price ceiling proposal and the OCA's recommendation to preclude EGSs from imposing termination and cancellation fees on CAP participants. With respect to the proposed price ceiling, the PUC reiterated its position that it lacked authority to limit prices charged by EGSs. With respect to concerns from PECO and Petitioners about the impact of higher EGS rates on CAP participants as well as non-CAP customers who subsidize CAP costs through base rates and the USFC, the PUC responded:

> We fully appreciate the concerns expressed by PECO, the OCA and the Joint Petitioners regarding the potential impact that higher EGS rates could have on CAP shopping customers and other residential customers through the USFC. However, there is no evidence in this proceeding that demonstrates that the overall *long-run* electric rates for CAP shopping customers will be higher

9. *Opinion and Order Re: Petitions for Reconsideration and/or Clarification of Jan. 24, 2014 Opinion and Order,* PUC Docket No. P–2012– 2283641 (Entered Mar. 12, 2014), attached as Appendix B to OCA's Definitive Form Brief.

than if those customers are served under default service rates. We continue to believe that a robust competitive market coupled with effective customer education will result in the least-cost option for all customers, including CAP shopping customers. Consequently, we reject the arguments that giving CAP customers access to the same shopping opportunities as other residential customers is in conflict with 66 Pa.C.S. § 2802(10) by jeopardizing "the protections, policies, and services that now assist customers who are low-income to afford electric service."

(Reconsideration Order at 11 (emphasis in original).) The PUC also expressly rejected Petitioners' contention that PECO's proposed rate ceiling was analogous to the PUC-approved Standard Offer Program, which requires participating EGSs to cap their fixed rate to enrolled customers at 7% below PECO's PTC at the time of enrollment:

PECO's proposed price ceiling would be a restriction on all EGS-initiated offerings to CAP customers, which the [PUC] lacks the statutory authority to restrict. Alternatively, the various market enhancement programs, like PECO's Standard Offer Program, are optional programs in which EGSs may elect to participate in order to stimulate customer participation in shopping.

(Id. at 11–12.)

With regard to the OCA's proposal to prohibit early cancellation and termination fees, the PUC similarly held firm to its prior position:

Consistent with our disposition of rate ceilings for CAP customers, *supra*, we conclude that there are no new or novel

arguments that convince us that we have the statutory authority to prohibit EGSs from charging early termination or cancellation fees. However, we fully appreciate the impact that cancellation or termination fees, as well as increasing variable rates, can have on shopping customers, particularly low-income customers. In setting policy for retail electric markets, the Commonwealth is guided by the General Assembly's directive in the Electric [Choice] Act that electric suppliers provide:

... adequate and accurate customer information to enable customers to make informed choices regarding the purchase of all electricity services offered by the provider. Information shall be provided to consumers in an understandable format that enable customers to compare prices and services on a uniform basis.

66 Pa.C.S. § 2807(d)(2). Consequently, it is imperative that the education component of PECO's CAP Shopping Plan make customers aware of the potential consequences of cancellation and termination fees and variable rate contracts.

(*Id.* at 13–14.) [10]

## II. DISCUSSION

### A. Scope and Standard of Review

■ This Court's authority to reverse a decision of the PUC is limited to circumstances where substantial evidence supporting a necessary factual finding is lacking in the record, where the PUC erred as a matter of law, and where constitutional rights were violated. 2 Pa.C.S. § 704; *PECO Energy Co. v. Pa. Pub. Util. Comm'n,* 568 Pa. 39, 791 A.2d 1155, 1160

---

10. Commissioner Brown filed a Statement, dissenting in part, in which she reaffirmed her favorable view of PECO's proposed price ceiling. In addition, Chairman Robert F. Powelson and Commissioner Pamela A. Witmer filed a Joint Statement, providing additional justification for the PUC's Approval Order and Reconsideration Order.

(2002). We hasten to point out that courts should defer to the PUC's interpretations of the Code and its own regulations unless the PUC's interpretations are clearly erroneous. *Popowsky v. Pa. Pub. Util. Comm'n,* 550 Pa. 449, 706 A.2d 1197, 1203 (1997). This Court may not "substitute its judgment for that of the PUC when substantial evidence supports the PUC's decision on a matter within the commission's expertise." *Id.* at 1201. "Judicial deference is even more necessary when the statutory scheme is technically complex." *Id.* at 1203.

█ With respect to issues of law, our standard of review is *de novo* and our scope of review is plenary. *Mercury Trucking, Inc. v. Pa. Public Util. Comm'n,* 618 Pa. 175, 55 A.3d 1056, 1082 (2012). With respect to challenges to the PUC's factual findings, "[s]ubstantial evidence is such relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Phila. Gas Works v. Pa. Pub. Util. Comm'n,* 898 A.2d 671, 675 n. 9 (Pa.Cmwlth.2006).

### B. Authority of PUC

Petitioners' first issue on appeal involves a question of law. Petitioners contend that the PUC erred when it held that it lacked the authority to approve PECO's proposed price ceiling and to adopt the OCA's proposal to prohibit EGSs from charging early cancellation or termination fees as part of the PECO CAP Shopping Plan.

### 1. CAUSE–PA/TURN

CAUSE–PA/TURN contend that the PUC construed its authority under the Choice Act too narrowly. They argue that several provisions within the Choice Act evidence an intent by the General Assembly to preserve in the PUC the authority to act to protect the public and, particularly, low-income Pennsylvanians. Specifically, they point to the legislative declaration of policy, which, though including general statements endorsing deregulation of electric generation in the Commonwealth, includes several important provisions preserving the PUC's duty to protect the public, particularly low-income Pennsylvanians:

(7) This Commonwealth must begin the transition from regulation to greater competition in the electricity generation market *to benefit all classes of customers* and to protect this Commonwealth's ability to compete in the national and international marketplace for industry and jobs.

. . . .

(9) Electric service is essential to the health and well-being of residents, to public safety and to orderly economic development, and electric service *should be available to all customers on reasonable terms and conditions.*

(10) The Commonwealth *must, at a minimum, continue the protections, policies and services that now assist customers who are low-income to afford electric service.*

. . . .

(17) There are certain public purpose costs, *including programs for low-income assistance,* energy conservation and others, which have been implemented and supported by public utilities' bundled rates. *The public purpose is to be promoted by continuing universal service* and energy conservation policies, protections and services, and full recovery of such costs is to be permitted through a nonbypassable rate mechanism.

Section 2802 of the Choice Act, 66 Pa.C.S. § 2802 (emphasis added). CAUSE–PA/ TURN point specifically to subsection (14)

as evidence of the General Assembly's intent to preserve in the PUC the authority to regulate EGSs where necessary to protect the public:

(14) This chapter requires electric utilities to unbundle their rates and services and to provide open access over their transmission and distribution systems to allow competitive suppliers to generate and sell electricity directly to consumers in this Commonwealth. The generation of electricity will no longer be regulated as a public utility function *except as otherwise provided for in this chapter. Electric generation suppliers will be required to* obtain licenses, demonstrate financial responsibility and *comply with such other requirements concerning service as the commission deems necessary for the protection of the public.*

*Id.* § 2802(14) (emphasis added). Moreover, they argue that nothing in the Choice Act repealed or otherwise limited the PUC's obligation under the Code to ensure that rates are "just and reasonable." *Id.* § 1301.[11]

Relying, *inter alia,* on these provisions from the Choice Act, CAUSE–PA/TURN contend that the PUC's refusal to recognize its authority to impose the proposed measures with respect to EGS participation in the PECO CAP Shopping Plan is in conflict with the General Assembly's express intent that the PUC continue to protect low-income Pennsylvanians through universal service programs, such as the CAP. Moreover, the PUC's failure to do so harms not only CAP participants, but also PECO's non-CAP customers, who will unnecessarily be placed at added financial risk without the proposed protective measures.

CAUSE–PA/TURN, as they did in proceedings before the PUC, point to the PUC's approval of the Standard Offer Program as part of the PECO DSP II proceeding, under which a participating EGS *must* offer a fixed, twelve month contract at a rate equal to or below 7% of the PTC at the time of enrollment and may not charge early cancellation fees. In the same proceeding, PUC ordered PECO to create the CAP Shopping Plan. Yet, when PECO submitted its CAP Shopping Plan for approval, the PUC claimed that it lacked authority to cap participating EGS rates or to prohibit EGSs from imposing cancellation fees. CAUSE–PA/TURN argue that the PUC's effort to avoid this inconsistency by differentiating between the two programs fails and that the positions are irreconcilable.

Finally, CAUSE–PA/TURN contend that the PUC's decision failed to ensure that the CAP is "operated in a cost-effective manner," in violation of the PUC's statutory obligation under Section 2804(9) of the Choice Act, 66 Pa.C.S. § 2804(9).[12]

---

**11.** Section 1301 of the Code, 66 Pa.C.S. § 1301, provides:

Every rate made, demanded, or received by any public utility, or by any two or more public utilities jointly, shall be just and reasonable, and in conformity with regulations or orders of the commission. Only public utility service being furnished or rendered by a municipal corporation, or by the operating agencies of any municipal corporation, beyond its corporate limits, shall be subject to regulation and control by the commission as to rates, with the same force, and in like manner, as if such service were rendered by a public utility.

**12.** Section 2804(9) of the Choice Act provides:

The commission shall ensure that *universal service* and energy conservation policies, activities and services are appropriately funded and available in each electric distribution territory. Policies, activities and services under this paragraph shall be funded in each electric distribution territory by nonbypassable, competitively neutral cost-

## 2. *The OCA*

The OCA makes many of the same arguments as CAUSE–PA/TURN. In addition, the OCA points to Section 2809(e) of the Choice Act, 66 Pa.C.S. § 2809(e), which provides:

> The commission *may forbear* from applying requirements of this part which it determines are unnecessary due to competition among electric generation suppliers. In regulating the service of electric generation suppliers, the commission shall impose requirements necessary to ensure that the present quality of service provided by electric utilities does not deteriorate, including assuring that adequate reserve margins of electric supply are maintained and assuring that 52 Pa.Code Ch. 56 (relating to standards and billing practices for residential utility service) are maintained.

(Emphasis added.) The OCA argues that this section of the Choice Act empowers the PUC, in its discretion, to "forbear" from applying the Code to EGSs; it does not, however, *bar* the PUC from exercising regulatory authority over EGSs. The OCA points to the fact that the Choice Act affirmatively compels the PUC to maintain the affordability of electricity for low-income Pennsylvanians. This is an area where the PUC *must* act and not forbear from acting. As an example, the OCA points to a decision by the New York Public Service Commission (N.Y.PSC), which, unlike the PUC, determined that it had the authority to limit the price an EGS could charge a CAP customer under its

recovery mechanisms that fully recover the costs of universal service and energy conservation services. The commission shall encourage the use of community-based organizations that have the necessary technical and administrative experience to be the direct providers of services or programs which reduce energy consumption or other-

authority to manage the affordability of low-income customer assistance programs.

## 3. *The PUC*

In response, the PUC contends that it did not rule below that it lacked the authority to establish program rules in PECO's CAP Shopping Plan to ensure the program's affordability and cost-effectiveness. Instead, the PUC claims that it held that it simply lacked the authority to (a) impose a limit on the EGS shopping price to a rate at or below the PTC or (b) to prohibit EGSs from charging CAP customers cancellation or termination fees. The PUC argues that none of the provisions in the Code cited by Petitioners support their contrary positions.

Citing to the legislative declaration of policy in the Choice Act, the PUC notes that the General Assembly expressly determined that it was "in the public interest to permit retail customers to obtain direct access to a competitive generation market." *Id.* § 2802(3). Through the Choice Act, the General Assembly intended that all electric utilities unbundle their rates and provide EGSs access to their distribution systems to sell electricity directly to the consumers of the Commonwealth. *Id.* § 2802(14). The declaration of policy continues:

> The generation of electricity will no longer be regulated as a public utility function except as otherwise provided for in this chapter. [EGSs] will be required to obtain licenses, demonstrate financial responsibility and comply with

wise assist low-income customers to afford electric service. *Programs under this paragraph shall be subject to the administrative oversight of the commission which will ensure that the programs are operated in a cost-effective manner.*
(Emphasis added).

such other requirements concerning service as the commission deems necessary for the protection of the public.

*Id.*

Implementing the above-quoted declaration of policy is Section 2806(a) of the Choice Act, 66 Pa.C.S. § 2806(a), which provides:

The generation of electricity shall no longer be regulated as a public utility service or function except as otherwise provided for in this chapter at the conclusion of a transition and phase in period beginning on the effective date of this chapter and ending, consistent with the commission's discretion under this section, January 1, 2001. As of January 1, 2001, consistent with the commission's discretion under this section, all customers of [EDCs] in this Commonwealth shall have the opportunity to purchase electricity from their choice of [EGSs]. The ultimate choice of the [EGS] is to rest with the consumer.

The PUC notes that during the phase-in period to electric choice, the Choice Act expressly capped EDC rates at 1996 levels. PECO's statutorily-imposed rate cap expired on January 1, 2011, and PECO's customers became eligible to shop for their EGS as of that date. The PUC contends, however, that PECO did not extend that right to shop to its CAP customers, forcing the PUC to take action.

Although Section 501(b) of the Code, 66 Pa.C.S. § 501(b), provides the PUC with the "general administrative power and authority to supervise and regulate all public utilities doing business within this Commonwealth" and Section 1301 of the Code authorizes the PUC to regulate the rates of public utilities, the PUC notes that electricity generation is no longer regulated as a public utility service or function in the Commonwealth. *See* 66 Pa.C.S. § 102 (defining "public utility" as excluding EGSs except for specific limited purposes); *id.* § 2806(a). As added support, the PUC cites to the Pennsylvania Supreme Court's decision in *Delmarva Power & Light Co. v. Commonwealth*, 582 Pa. 338, 870 A.2d 901 (2005), wherein the Supreme Court opined that the General Assembly, through the Choice Act, intended that EGSs be excluded from the definition of "public utility" for most purposes, subject to limited express exemptions. *Delmarva Power & Light Co.*, 870 A.2d at 910. Because EGSs are not public utilities for purposes of the PUC's rate regulation authority, the PUC contends that it did not err in concluding that it lacked the power to cap EGS rates or impose other rate-related restrictions.

The PUC also takes issue with Petitioners' reliance on portions of the legislative declaration of policy in Section 2802 of the Choice Act. It contends that none of these provisions, separately or collectively, authorize the PUC to regulate EGS rates. With respect to OCA's reliance on Section 2809(e) of the Choice At, the PUC contends that it did not elect to forbear from applying provisions of the Choice Act; rather, it determined that it lacked the authority under the law to implement the pricing measures advocated by Petitioners.

The PUC acknowledges that the PECO Standard Offer Program rules, as approved by the PUC, cap the initial rate that an EGS may charge a customer at the time of enrollment at 7% of the PECO PTC. The PUC contends, however, that the Standard Offer Program is an optional program to *enhance* competition in an already open market for electric generation supply. The 7% cap is an incentive to move customers who have not availed themselves of the shopping opportunity into the competitive market, "kick starting" retail competition. PECO CAP customers, by contrast, do not currently have access to the competitive market. The

PECO CAP was a barrier of entry for EGSs wishing to service those customers. The PUC argues that this distinction justifies allowing a rate ceiling with respect to the Standard Offer Program, but not with respect to the CAP Shopping Plan.

With respect to NYPSC decision, the PUC contends that the OCA mischaracterizes the decision. The PUC contends that in the cited decision, the NYPSC *did not* profess to have authority to regulate the rates charged by EGSs to customers in low-income assistance programs. Instead, it merely stated that EGSs must provide guaranteed savings or value, in some form, over what the customer would have received from the utility. The NYPSC did not cap EGS rates.

Finally, with respect to its obligation under Section 2804(9) of the Choice Act to ensure that universal service programs, such as CAPs, are appropriately funded and operated in a cost-effective manner, the PUC contends that Petitioners have failed to prove that the absence of the proposed limitations on EGSs in PECO's CAP Shopping Plan will lead to an underfunded, unaffordable, or ineffectively-operated CAP. Rather, the PUC contends that Petitioners' position is littered with assumptions, the most notable of which is an assumption that in the absence of the pricing restrictions that PECO and the OCA proposed, PECO's CAP would fail for adequate funding and/or not be cost-effective.

### 4. Direct Energy [13]

With respect to the question of the PUC's authority to cap the rates EGSs may charge CAP customers, Direct Energy concedes that the Choice Act provides for some regulatory oversight of EGSs. That regulatory oversight, however, does not extend to rate regulation. Direct Energy contends that both the proposed PECO price ceiling and the OCA-proposed prohibition on cancellation and termination fees constitute the regulation of EGS rates, which the PUC lacks the authority to do under the Choice Act.

Like the PUC, Direct Energy also attempts to draw a distinction between the CAP and the Standard Offer Program. It contends that the Standard Offer Program is a market enhancement program in which customers and EGSs may choose to participate. But, even if a customer chooses not to participate in the Standard Offer Program, it may still avail itself of the right to shop in the competitive market for its EGS of choice. In other words, the Standard Offer Program is not the exclusive vehicle available to the customer to reach an EGS, and it is not the exclusive vehicle for the EGS to sell to the customer. The Standard Offer Program thus does not impede a customer's right to shop in the competitive market.

The same, however, cannot be said of the CAP. Direct Energy contends that EGSs currently have no control over CAPs and no direct access to CAP customers. They also note that the Standard Offer Program is not currently open to CAP participants. Any rule that dictates the terms of service offered by an EGS to a CAP customer would be an illegal restraint on the CAP customer's only option for shopping. Direct Energy contends that this restriction fails to place CAP customers on equal footing with non-CAP customers in violation of the Choice Act. It argues that it would be unfair to force CAP participants to choose between participating in the CAP and receiving the

---

13. On appeal, Direct Energy is joined in its brief by Intervenor Retail Energy Supply Association, a trade organization of EGSs. For purposes of analyzing the parties' arguments on appeal, we refer to both collectively as Direct Energy.

benefits of that important program and shopping in the open market, contending:

> It is .... ironic that low[-]income advocates would be supportive of requiring low[-]income customers to choose between a program that affords them financial assistance and their statutory right to shop especially when the ability to do both provides the greatest potential for cost savings for the low[-]income customer.

(Direct Energy Br. at 13.)

### 5. Analysis

■ The only question we address here is whether the PUC has the authority to impose, or in this case approve, certain CAP rules, which would limit a participating customer's ability to choose an EGS and remain eligible for CAP benefits. Whether an agency has the authority to act in a certain fashion is purely a question of law. On this question, the Pennsylvania Supreme Court has opined:

> This Court has long adhered to the precept that the· power and authority exercised · by administrative agencies must be conferred by legislative language that is clear and unmistakable.

At the same time, we recognize that the General Assembly has prescribed that legislative enactments are generally to be construed in such a manner as to effect their objects and promote justice, and, in assessing a statute, courts are directed to consider the consequences of a particular interpretation, as well as other factors enumerated in the Statutory Construction Act. Based upon such considerations, the rule requiring express legislative delegation is tempered by the recognition that an administrative agency is invested with the implied authority necessary to the effectuation of its express mandates.

*Commonwealth, Dep't of Transp. v. Beam,* 567 Pa. 492, 788 A.2d 357, 359 (2002) (citations omitted).[14]

It is undisputed that the passage of the Choice Act in 1996 was transformative. The central objective of the legislation was to allow retail customers in the Commonwealth to purchase their electricity directly from an EGS, rather than rely on their local utility as the exclusive source for generation, transmission, and distribution. 66 Pa.C.S. § 2804(2). Under the Choice

---

**14.** In addition, because of the PUC's authority under the Code and, more specifically, the Choice Act, this Court is guided by the Statutory Construction Act of 1972, 1 Pa.C.S. §§ 1501–1991, which provides that "[t]he object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." 1 Pa.C.S. § 1921(a). To determine "legislative intent, all sections of a statute must be read together and in conjunction with each other, and construed with reference to the entire statute." *Hous. Auth. of the Cnty. of Chester v. Pa. State Civil Serv. Comm'n,* 556 Pa. 621, 730 A.2d 935, 945 (1999). "The clearest indication of legislative intent is generally the plain language of a statute." *Walker v. Eleby,* 577 Pa. 104, 842 A.2d 389, 400 (2004). "When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spir-

it." 1 Pa.C.S. § 1921(b). Only "[w]hen the words of the statute are not explicit" may this Court resort to statutory construction. 1 Pa. C.S. § 1921(c). "A statute is ambiguous or unclear if its language is subject to two or more reasonable interpretations." *Bethenergy Mines, Inc. v. Dep't of Envtl. Prot.,* 676 A.2d 711, 715 (Pa.Cmwlth.), *appeal denied,* 546 Pa. 668, 685 A.2d 547 (1996). Moreover, "[e]very statute shall be construed, if possible, to give effect to all its provisions." 1 Pa.C.S. § 1921(a). It is presumed "[t]hat the General Assembly intends the entire statute to be effective and certain." 1 Pa.C.S. § 1922(2). Thus, no provision of a statute shall be "reduced to mere surplusage." *Walker,* 842 A.2d at 400. Finally, it is presumed "[t]hat the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable." 1 Pa.C.S. § 1922(1).

Act, public utilities are required to open their jurisdictional transmission and distribution facilities to EGSs chosen by the public utility's retail customers. *Id.* § 2804(6). Moreover, while the chosen EGS is obligated to provide the contracted supply, the public utility, or EDC, remains the direct contact with the consumer on matters relating to billing and customer service. *Id.* § 2807(c), (d). If a customer contracts for electric supply and it is not delivered or if a customer does not choose an alternative EGS, in most cases the public utility is required to purchase electric energy at prevailing market prices to service that customer—*i.e.,* default service. *Id.* § 2807(e).

Although the PUC continues to regulate the transmission and distribution rates of public utilities under Chapter 13 of the Code, the generation of electricity is no longer regulated as a public utility. *Id.* §§ 102, 2804(10), 2806(a); *Delmarva Power & Light Co.,* 870 A.2d at 910. Thus, the PUC lacks the authority to regulate EGS rates under Chapter 13. This means that the PUC may not review EGSs rates to determine whether the rates are "just and reasonable." 66 Pa.C.S. § 1301. It also means that the PUC lacks the authority to compel EGSs to file tariffs. *Id.* § 1302. Moreover, the power of the PUC under Section 1304 of the Code to ensure that rates are not unlawfully discriminatory does not extend to the rates charged by EGSs. *Id.* § 1304.[15]

What is particularly noteworthy about the legal arguments of the PUC and Direct Energy is their focus on the PUC's lack of authority to regulate the rates EGSs charge to customers. We are persuaded, however, by Petitioners' contention that the absence of authority to regu-

late EGS rates alone does not compel the conclusion that the PUC lacks the authority to adopt rules attendant to universal service programs that may have the effect of limiting competition and choice with respect to low-income customers. In this case, Petitioners posit a tension between the PUC's obligation under Section 2804(2) of the Choice Act to "allow customers to choose among [EGSs] in a competitive generation market through direct access" and its obligation under Section 2804(9) of the Choice Act to ensure that universal service plans are "appropriately funded" and administered by the PUC to "ensure that the programs are operated in a cost-effective manner."

There can be no question, at this juncture, that the overarching goal of the Choice Act is competition through deregulation of the energy supply industry, leading to reduced electricity costs for consumers. But the scheme does not demand absolute and unbridled competition. This Court's decision in *PP & L Industrial Customer Alliance v. Pennsylvania Public Utility Commission,* 780 A.2d 773 (Pa. Cmwlth.2001) (en banc), which Direct Energy cites in its brief, illustrates this point. In that case, Pennsylvania Power & Light (PP & L), a public utility, elected to change the method by which it billed its customers who have procured electric supply from an alternative EGS. Customers affected by this change are those who contracted with PP & L to accept interruptible service (IS) for at least one year. The rates for this level of service were reflected in PP & L's filed tariff at Rate Schedules IS–P and IS–T:

> Under both of these rate schedules, eligible customers can purchase interruptible distribution service which means

---

**15.** The PUC, however, is obligated under the Choice Act to ensure that electric choice in Pennsylvania is "implemented in a manner

that does not unreasonably discriminate against one customer class to the benefit of another." 66 Pa.C.S. § 2804(7).

that PP & L can request the customer to curtail electricity usage "as required for economic load control, for system and local emergencies, and for tests of the customer's ability and readiness to interrupt load during an emergency." *PP & L Industrial*, 780 A.2d at 776 (quoting tariff). The tariff required customers to interrupt—*i.e.*, curtail usage, during emergencies and emergency tests. If the customer did not interrupt, or curtail, usage during these periods to a prescribed level (called "Firm Power"), the customer was assessed an additional distribution charge and penalty. During periods of economic load control, the customer had the option to interrupt or incur an additional charge for continued use during this period. Customers who chose IS paid discounted rates from those charged to customers who elect uninterruptable, or firm service. *Id.* at 776–80, 780 n. 11.

An *ad hoc* association of PP & L customers (PPLICA) objected to the way PP & L applied this tariff to customers who contracted with an alternative EGS for electric supply at either a firm service level (*i.e.*, uninterruptable) or at a level less interruptible than what PP & L demanded from its IS customers. It argued that PP & L's methodology forced those customers to curtail usage to the PP & L Firm Power level during emergency interruption or face additional charges by PP & L under the tariff. This, PPLICA contended, deprived these customers of the benefit of their contract with the EGS under the Choice Act.

The PUC rejected PPLICA's challenge to the PP & L methodology. We explained the PUC reasoning:

The PUC ... found that interruptible service was needed to preserve system reliability. Even though de-regulation would not be fostered if a customer was, in effect, penalized by buying firm power on the open market, the PUC found that allowing PP & L, as the distributor, to have control over the interruptibility of its supply purchased from an EGS was needed because, "to allow interruptible service customers to avoid an obligation to curtail load during emergencies would, at this juncture of Electric Competition, defy our efforts to promote system reliability considerations." In effect, what the PUC found was that all power on the grid ..., no matter where bought and no matter firm or not, was always subject to interruption for system reliability.

*Id.* at 781–82 (footnote omitted). We affirmed the PUC's decision:

PPLICA's argument that it should not be penalized because it has purchased firm power and should not be forced to curtail usage "encouraged" by increased distribution rates and penalties and not by any shortage of capacity to distribute the power, shows one of the seams in the de-regulatory scheme. While every customer, as envisioned under that scheme, should be able to shop for the lowest rate and highest quality of service, there has to be some mechanism so that there is overall system reliability for all customers on the grid.

Prior to de-regulation, there only existed one entity that could be charged with overseeing the interruptibility of service—the local utility that originally provided supply, transmission and distribution of service. However, since de-regulation, some mechanism has to be in place so that during periods of peak demand, there are no brownouts or blackouts on the system. While PPLICA is essentially questioning the "fairness" of allowing a distributor of supply such as PP & L to control the interruptibility of the service, only the distributor is in position to enhance

system reliability because of the myriad of generators and transmission companies that place power in a particular distribution grid. To allow shopping customers to receive discounted rates under the interruptible service rate schedules but disregard PP & L's calls for emergency interruptions would jeopardize the reliability of service because shopping customers would purchase firm electric supplies from EGSs because there would be no incentive for them of reducing power during times of peak capacity.

*Id.* at 782. Like the PUC, however, we recognized a perceived ·inconsistency between the Choice Act and the disposition of the matter. Nonetheless, we held that under certain circumstances, unbridled competition may have to give way to other important concerns:

> While it cannot, under the mantra of system reliability, re-regulate the indus-. try by favoring the distribution company, thereby thwarting the goals of the [Choice] Act, the PUC can, *as long it provides substantial reasons why there is no reasonable alternative so competition needs to bend to ensure overall system reliability,* order customers by whatever scheme to curtail usage during abnormal peaks.

*Id.* (emphasis added).

There is yet another example of the PUC exercising its authority to "bend" competition under the Choice Act. The PUC and Direct Energy go to great lengths in their briefs to explain the differences between the PECO Standard Offer Program and the PECO CAP. In essence, they argue that the rate cap that is part of the Standard Offer Program is lawful because the Standard Offer Program is a market enhancement program—*i.e.,* it encourages customers that may already choose their EGS in the competitive mar-

ketplace to do so. By contrast, a price ceiling in the PECO CAP Shopping Plan is a barrier to shopping in a program where shopping is not currently permitted. We find this line of reasoning unpersuasive. The distinctions between the two programs that the PUC and Direct Energy emphasize are not material to the legal question of whether the PUC has statutory authority to implement, or approve, an EGS price ceiling under any circumstance. If, as the PUC and Direct Energy argue, the PUC lacks the authority to place a cap on the rate an EGS may charge a retail customer, it seems to us that such lack of authority would extend to the CAP as well as to the Standard Offer Program.

Following the reasoning of both the PUC and this Court, as set forth in *PP & L Industrial,* we conclude that the PUC has the authority under Section 2804(9) of the Choice Act, in the interest of ensuring that universal service plans are adequately funded and cost-effective, to impose, or in this case approve, CAP rules that would limit the terms of any offer from an EGS that a customer could accept and remain eligible for CAP benefits. The obligation to provide low-income programs falls on the public utility under the Choice Act, not on the EGSs. Moreover, the Choice Act expressly requires the PUC to administer these programs in a manner that is cost-effective for both the CAP participants and the non-CAP participants, who share the financial consequences of the CAP participants' EGS choice.

Our conclusion finds support in the Choice Act's legislative declaration of policy, which both encourages deregulation to allow consumers the opportunity to purchase directly their electric supply from EGSs and emphasizes the need to continue and maintain programs that assist low-income customers to afford electric service. 66 Pa.C.S. § 2802(7), (9), (10), (14),

(17). So long as it "provides substantial reasons why there is no reasonable alternative so competition needs to bend" to ensure adequately-funded, cost-effective, and affordable programs to assist customers who are of low-income to afford electric service, *PP & L Indus.*, 780 A.2d at 782, the PUC may impose CAP rules that would limit the terms of any offer from an EGS that a customer could accept and remain eligible for CAP benefits—*e.g.*, an EGS rate ceiling, a prohibition against early termination/cancellation fees, etc.

### C. Substantial Evidence

Having resolved the question of whether the PUC has the authority to adopt the CAP Shopping Program restrictions proposed by PECO and OCA, we now turn to the question of whether the PUC's decision to reject those restrictions should be reversed. Petitioners argue that the PUC's reasons for rejecting the PECO and OCA proposals lack substantial evidence support in the record. Indeed, they argue that by failing to approve the proposals, the PUC has failed to ensure that universal service plans are adequately funded and cost-effective in violation of the PUC's duty under Section 2804(9) of the Choice Act.

### 1. CAUSE–PA/TURN

CAUSE–PA/TURN contend: "The PUC simply failed to assess, analyze, or point to any evidence to ensure that approval of a CAP shopping plan with no price limitations would result in just and reasonable rates for all customers, CAP and non-CAP alike, in accordance with this and other duties imposed throughout the ... Code." (CAUSE–PA/TURN Br. at 35–36.) CAUSE–PA/TURN specifically challenge the PUC's finding that "there is no evidence in this proceeding that demonstrates that the overall *long-run* electric rates for

CAP shopping customers will be higher than if those customers are served under default service rates." (Reconsideration Order at 11 (emphasis in original).)

In support of their challenge, CAUSE–PA/TURN refer to the record testimony of Alan B. Cohn. Mr. Cohn testified that if CAP customers are permitted to contract with an EGS at a rate above the PECO PTC, there would be negative financial consequences for both CAP and non-CAP customers. Using PECO's current CAP structure, Mr. Cohn explained that if 25% of PECO's CAP customers contracted with alternative EGSs for supply at a rate 10% above PECO's PTC on average, this would add an additional $1 million to the PECO CAP shortfall that would need to be recovered from PECO's non-CAP customers. (R.R. 169a.)

The CAP customer would have to pay more as well, because the customer's CAP discount is a percentage of the amount billed by the EDC. Though the discount percentage remains the same, the higher the amount billed, the more the low-income customer will pay on a monthly basis. Again relying on the PECO CAP structure, Mr. Cohn testified that assuming a monthly usage of 1,000 kWh and an EGS purchase price of 10% above the PTC, the CAP customer's bill would increase by $5.31 per month, or $64.00 per year. Mr. Cohn testified that this increase is not insignificant for a low-income customer, as it translates to an increase of about 7–14% of the overall energy burden of the customer. (R.R. 170a.) CAUSE–PA/TURN contend that the PUC did not address this evidence in its decisions.

CAUSE–PA/TURN also point to record evidence relating to the shopping experience of PPL Electric Utilities Corp. (PPL Electric) CAP customers. In a brief filed with the PUC, PECO noted that in PPL Electric's most recent default service pro-

ceeding before the PUC, PPL Electric reported that 73% of its CAP customers who shopped for supply in the competitive market were paying more than the applicable PTC. (R.R. 222a.) CAUSE–PA/TURN contends that with this evidence, the PUC should have concluded that PECO CAP customers are likely to have the same experience unless the PUC accepted the proposed price restrictions.

Next, CAUSE–PA/TURN points to the expert testimony of Roger Colton. Generally, Mr. Colton opined that allowing EGSs to charge CAP customers an amount in excess of the PTC would make the CAP less affordable than it is under its current structure, fundamentally undermining the overarching purpose of universal service programs, which is to ensure that electricity is available to low-income Pennsylvanians at an affordable price. Mr. Colton testified that the PTC serves as a baseline of affordability. Like Mr. Cohn, Mr. Colton testified about how rates in excess of the PECO PTC would adversely affect both CAP and non-CAP customers. (R.R. 101a, 105a, 178a.) [16]

CAUSE–PA/TURN contend that this record evidence amply supports the need for an EGS price ceiling and prohibition with respect to cancellation and termination fees as part of the PECO CAP Shopping Plan. They argue that the PUC's conclusion that no price restrictions are necessary because "a robust competitive market coupled with effective customer education will result in the least-cost option for all customers, including CAP shopping customers" lacks any record support. Save one witness from Direct Energy, who testified generally about concerns over the impact price restrictions would have on the willingness of EGSs to serve CAP participants, CAUSE–PA/TURN argues that the overwhelming record evidence supports the need for the proposed price restrictions to protect CAP and non-CAP customers from "significant financial harm." (CAUSE PA/TURN Br. at 42–43.)

### 2. OCA

OCA touches on much of the same evidence that CAUSE–PA/TURN cites in its brief, particularly the testimony of Mr. Colton. OCA presses its position, however, that by failing to implement the proposed price restrictions to make the CAP affordable, as required under Section 2804(9) of the Choice Act, the PUC is also abdicating its duty under Section 1301 of the Code to ensure that every rate made or demanded by a public utility, in this case PECO, is "just and reasonable." OCA argues that the failure of the PUC to ensure that the CAP is run in a cost-effective manner leads to unjust and unreasonable cost-recovery rates imposed by PECO against its non-CAP customers.

### 3. PUC

The PUC responds by claiming an absence of any record evidence to support the view that a CAP without an EGS rate ceiling and/or a prohibition against cancellation or termination fees means an inadequately funded plan or a plan that is not cost-effective or affordable. The PUC contends that Petitioners' position relies on two assumptions: (1) that all EGSs will

---

**16.** CAUSE–PA/TURN point to hardship suffered by customers on variable rate contracts, noting specifically price spikes in January 2014. They contend that the proposed price restrictions were also critical to protect CAP customers from this risk of harm. In examining the record, however, it appears that OCA raised this argument below with respect to a proposal to preclude EGSs from moving CAP customers to variable price contracts at the end of an initial term. (R.R. 229–30a.) The PUC's decision to reject that proposal is not before us for appellate review. Accordingly, we will not consider this argument.

offer CAP customers a rate that is higher than PECO's PTC; and (2) that CAP customers will choose to switch to an EGS that quotes a higher rate than the PECO PTC. With respect to the first assumption, the PUC contends that it is impossible to predict the future EGS pricing in PECO's territory. With respect to the second assumption, the PUC contends that it is unreasonable to believe that all or even the majority of CAP customers will elect to pay higher generation rates. Rather, the PUC contends that the best thing PECO and the PUC can do is educate CAP participants on how to make smart choices. In essence, the PUC contends that Petitioners are not giving the CAP participants enough credit and assume that CAP participants are simply incapable of making their own choices on how to save on their electric bills.

The PUC rejects the evidence cited by Petitioners relating to the experience of PPL Electric. The PUC acknowledges the statistic included in PECO's brief to the PUC, regarding 73% of PPL Electric CAP shopping customers paying more than the applicable PTC. The PUC notes, however, that in the next sentence, PECO acknowledged that the PUC rejected as speculative any assertion that PPL Electric's CAP customers were being harmed because of shopping and concluded that PPL Electric's CAP customers should be allowed to participate in that public utility's Standard Offer Program. (R.R. 222a.) According to the PUC, it consistently held below that the harm to PECO CAP customers that Petitioners wish to avoid is speculative and is insufficient to support a rule that limits CAP customer choice.

Finally, the PUC contends that its decision to reject the proposed measures constituted a sound exercise of discretion supported by a weighing of the evidence both in favor of and against the proposals from PECO and the OCA.

### 4. Direct Energy

In addition to adopting similar positions to those expressed by the PUC in its brief, alluding to record testimony of its witness, Christopher Kallaher, Direct Energy argues that there is record support for the PUC's concern that placing limits on the terms under which an EGS may contract with a CAP customer will adversely affect the CAP customers' rights to participate in the competitive market.

### 5. Analysis

The General Assembly, through the Choice Act, has made a broad policy decision that "[c]ompetitive market forces are more effective than economic regulation in controlling the cost of generating electricity." 66 Pa.C.S. § 2802(5). The General Assembly is clearly of the view that "greater competition in the electricity generation market" benefits "all classes of customers," including those of low income. *Id.* § 2802(7). It is not the role of this Court to second-guess that policy; rather, we must enforce it within the bounds of the United States and Pennsylvania Constitutions. *Program Admin. Servs., Inc. v. Dauphin Cnty. Gen. Auth.,* 593 Pa. 184, 928 A.2d 1013, 1017–18 (2007).

 As we held above, however, the General Assembly has reserved within the PUC the authority to "bend" competition to further other important aspects of the Code, including the Choice Act, where it provides substantial reasons why the restriction on competition is necessary (*i.e.,* there are no reasonable alternatives). As the proponents of the rule restrictions in this case, PECO and the OCA had the burden of proof and ultimately the burden to persuade the PUC to enact the proposed restrictions on competition. 66 Pa.

C.S. § 332(a) ("[T]he proponent of a rule or order has the burden of proof."). In this matter, PECO proposed a rule that would require EGSs wishing to participate in PECO's CAP to agree to charge a rate for electricity supply to CAP customers that is at or below PECO's PTC. OCA proposed a rule with respect to PECO's CAP Shopping Plan that would prohibit participating EGSs from charging CAP customers cancellation or termination fees.

On the PECO proposed price ceiling, the PUC considered the respective positions of the parties, but ultimately sided with EGS concerns that imposing such a ceiling may adversely affect available choices for CAP participants. On this point, Mr. Kallaher testified:

> [A] hard cap on prices, unrelated to market conditions at the time of sale, is anti-competitive and unwarranted.... [A] condition that requires a price always remain at or below the PTC creates a significant price risk for suppliers and would inevitably create a barrier to their participation in any CAP shopping program. The risk in serving those customers would make them undesirable from a business perspective, meaning that few, if any, EGSs would be interested in addressing the substantial number of customers in the market who qualify for CAP benefits. Further, those EGSs would offer service to CAP-eligible customers would be forced to tailor their offerings not to what would be best for those customers but to the exigencies of serving customers in a price-capped environment. In other words, the price cap makes the PECO proposal something other than a real attempt to bring choice to CAP eligible customers....

(R.R. 162a–63a.) Mr. Kallaher testified further about the challenges of providing a product that would comply with the proposed rate ceiling:

> As a practical matter, an EGS could only offer variable priced products, as the price would possibly need to shift every three (3) months as PECO's PTC changes. A supplier could not guarantee a fixed price beyond the next default service price change.

(*Id.* 163a.)

Mr. Kallaher's testimony is substantial evidence supporting the PUC's decision to reject the proposed PECO price ceiling. While there is record evidence to support Petitioners' view that a price ceiling would benefit CAP participants and, by extension, non-CAP participants, it is not our role to reweigh the evidence below or to substitute our judgment for that of the PUC, particularly on matters within the PUC's area of expertise. *Lehigh Valley Transp. Servs., Inc. v. Pa. Pub. Util. Comm'n,* 56 A.3d 49, 56 (Pa.Cmwlth.2012). Simply put, the PUC was not persuaded that Petitioners' evidence provided a substantial reason to justify limiting competition by imposing a price ceiling on EGSs as part of the PECO CAP Shopping Plan. (Approval Order at 14–15; Reconsideration Order at 11–12.) Similarly, Petitioners failed to convince the PUC that customer education programs are inadequate (*i.e.,* not a reasonable alternative to price regulation) to the task of ensuring that CAP participants, and by extension non-CAP participants, benefit from the opportunity to shop for their EGS.

While there is record evidence to support the PUC's findings that a price ceiling would be anti-competitive and limit the choices available to CAP participants, neither the PUC nor Direct Energy cite evidence in the record that would support similar findings with respect to the OCA proposal to prohibit early cancellation/termination fees. In its Reconsideration Order, the PUC recognized that such fees may impede the ability of CAP customers

to escape from unaffordable variable rate contracts, particularly during periods of price spikes: "[W]e fully appreciate the impact that cancellation or termination fees, as well as increasing variable rates, can have on shopping customers, particularly low-income customers." (Reconsideration Order at 13.) Accordingly, there does not appear to be any dispute that the OCA proposal would provide an added layer of protection to CAP participants consistent with the affordability goals of the Choice Act.

Nonetheless, in rejecting the OCA proposal, the PUC leaned again on the consumer education component of the Choice Act:

> The commission shall . . . require each . . . [EGS] . . . to provide adequate and accurate customer information to enable customers to make informed choices regarding the purchase of all electricity services offered by that provider. Information shall be provided to consumers in an understandable format that enables consumers to compare prices and services on a uniform basis.

66 Pa.C.S. § 2807(d)(2). "[I]t is imperative that the education component of PECO's CAP Shopping Plan make customers aware of the potential consequences of cancellation and termination fees and variable rate contracts." (Reconsideration Order at 14.) We can agree with the PUC's determination that consumer education is critical. Statutorily-mandated disclosures and prohibiting early cancellation/termination fees, however, are not mutually exclusive, especially where there is a lack of evidence that the latter would adversely affect the competitive marketplace for CAP participants.

Accordingly, the PUC's decision to reject OCA's proposal to prohibit EGSs from imposing early cancellation and termination fees as part of the CAP Shopping Plan out of concern for the impact such a rule would have on competition and choice is not supported by substantial evidence. In the absence of such record evidence, and because the PUC has determined that early cancellation and termination fees, coupled with variable rate contracts, pose a risk to low-income shopping customers, we reverse this portion of the PUC's decisions and remand with instructions that the PUC approve a rule revision to the PECO CAP Shopping Plan that would prohibit CAP participants from entering into a contract with an EGS that includes early cancellation/termination fees.

Finally, we reject Petitioners' contention that the PUC has failed to ensure that universal service plans are adequately funded and cost-effective in violation of the PUC's duty under Section 2804(9) of the Choice Act. There is no evidence in this record upon which we could reach this conclusion with respect to a program that has not yet been implemented. We note, however, that the PUC's obligations under the Choice Act with respect to low-income Pennsylvanians are of a continuing nature. Moreover, every three years, EDCs are required to submit an updated universal service and energy conservation plan to the PUC for review and approval. 52 Pa.Code § 54.74(a)(1). This plan "should include revisions based on analysis of program experiences and evaluations." *Id.* § 54.74(a)(4). Accordingly, we anticipate that when PECO files its next Universal Service Plan, it will include in its filing an analysis of its CAP Shopping Plan, including how that plan has affected the availability and affordability of electricity supply for CAP participants and the cost-effectiveness of the CAP.

## III. CONCLUSION

For the reasons set forth above, we affirm the PUC's Approval Order and Re-

consideration Order with respect the PUC's rejection of a rule that would impose a price ceiling on EGSs that wish to participate in the PECO CAP Shopping Program. We reverse the portions of the Approval Order and Reconsideration Order which rejected a rule that would prohibit CAP participants from entering into any contract with an EGS that imposes early cancellation/termination fees. We remand this matter to the PUC with instructions that it approve a rule revision to the PECO CAP Shopping Plan that would impose such a prohibition.

**ORDER**

AND NOW, this 14th day of July, 2015, it is hereby ORDERED that the Opinions and Orders of the Pennsylvania Public Utility Commission entered January 24, 2014 and March 12, 2014, are AFFIRMED in part and REVERSED in part. This matter is remanded to the PUC for further proceedings in accordance with the accompanying opinion.

Jurisdiction relinquished.

**DISSENTING OPINION BY Judge PATRICIA A. McCULLOUGH.**

I agree with the Majority's remand of this case for Public Utility Commission (PUC) approval of a rule that would protect Customer Assistance Program (CAP) participants from early contract cancellation and termination fees that would otherwise be imposed by electric generation suppliers (EGSs). However, because I would go further and also instruct the PUC on remand to approve a rule that would impose a price ceiling on the EGSs that participate in PECO Energy Company's (PECO's) CAP shopping program, I respectfully dissent.

Specifically, I disagree that the limited testimony referenced by the PUC constitutes substantial evidence to support its

decision. The PUC fails to explain how excessive charges for alternative supply passed on to all PECO customers would be consistent with the statutory requirement that all rates be just and reasonable. Section 1301 of the Public Utility Code, 66 Pa.C.S. § 1301. Instead, the PUC relied on Direct Energy's assertion that if price restrictions were put in place, suppliers may be discouraged from serving CAP participants. (Reproduced Record at 162a–63a.) An assertion that few suppliers would be interested in serving CAP participants or that suppliers would have to tailor their offerings to satisfy the price limitations proposed by PECO is not substantial evidence.

To omit this important protection for CAP consumers leaves them a recourse without a remedy and exposes them to possible bait and switch tactics by EGSs. Changing electric suppliers is no small decision for consumers, especially low-income consumers, and they should have some assurance that if they do so, they do not run the risk of paying higher rates. Eliminating early cancellation and termination fees simply does not provide that assurance.

Accordingly, since this case has been remanded to the PUC, I would also include an instruction that the PUC hold an additional hearing to determine whether the universal service plans are properly funded and cost effective under section 2804(9) of the Electricity Generation Customer Choice and Competition Act, 66 Pa.C.S § 2804(9). As the Majority notes, PUC's duties to low-income Pennsylvanians "are of a continuing nature." (op. at 1108.) Given that this important case is already before the PUC, there is no reason why the PUC should delay its assessment of whether it is discharging its duties to low-

income Pennsylvanians until PECO files its next universal service plan.