DISSENTING OPINION BY
PRESIDENT JUDGE LEAVITT
The Pennsylvania Public Utility. Commission (PUC) has imposed a civil penalty of $1,836,125 upon HIKO Energy, LLC (HIKO), an electric generation. supplier (EGS), because its invoices to 5,708 customers over a four-month period “did not reflect the marketed prices and agreed upon prices in the disclosure statement.” 52 Pa. Code § 54.4(a). This civil penalty, the highest in the history of utility regulation in Pennsylvania when ordered, is grossly disproportionate to the penalties of $25,000 to $125,000 imposed upon other EGSs for the same conduct during the same time period. A grossly disproportionate civil penalty violates, the PUC’s Statement of Policy for calculating civil penalties and the constitutional ■ prohibition against excessive fines. Because the PUC erred and abused its discretion, I respectfully dissent from the majority’s decision to affirm the PUC.
HIKO has its principal place of business in New-York. In December of 2012, the PUC granted HIKO a license to supply electric generation services in Pennsylvania to residential, small commercial, large commercial, industrial, and governmental customers in the service territories of various electric distribution companies (EDO), The license was granted on condition of an 18-month probationary period, from December 2012 through June 2014, and shortly thereafter HIKO , began providing service in Pennsylvania. HIKO purchased electrical energy on the spot market and then sold it to retail customers. It developed its. customer list by door-to-door, telephone, and website solicitation. HIKO delivered electric service through utilities local to its customers.
In August 2013, HIKO began to offer a six-month introductory price, which guaranteed that the customer’s cost for electricity would be at least one to seven percent less than the price-to-compare (PTC) of the customer’s local utility. Thereafter, customers would be enrolled in HIKO’s variable rate program whereby prices would be determined by market conditions and climate. HIKO confirmed the introductory price offer in a “Welcome Letter and Disclosure Statement” issued to customers that accepted this.offer.[1]
*1116 In January 2014, wholesale market prices for electrical energy increased dramatically. A period of sustained cold weather, referred to as a “polar vortex,” caused a surge in the use of electricity in Pennsylvania. At the same time, an increase in natural gas prices in Canada increased the costs of electrical generating •plants. Prior to the polar vortex, PJM Interconnection LLC[2] (PJM) sold electricity to HIKO at approximately $0.08 per kWh. In January 2014, the price increased approximately 300% to $0,227 per kWh, and the price remained at or above $0,138 per kWh until April 2014. As a result, HIKO was able to secure electrical power only at exorbitant rates during this period.
Consistent with its variable rate program, HIKO passed its unexpected costs along to its customers. This decision included the 5,708 customers enrolled in HIKO’s introductory price discount program. During the first four months of 2014, those 5,708 customers were billed in the aggregate $3.29 million. Of that total, approximately $1.8 million represented charges in excess of the introductory price discount. HIKO charged customers as much as $0.29 per kWh, or up to 400% of the PTC of the local utility. The average aggregate overcharge for each HIKO customer in the introductory price discount program was $124. ALJ Decision at 13; Finding of Fact No. 29.
Customers complained to HIKO. In response, beginning in February 2014, HIKO made refunds that totalled $159,320.15. It also stopped offering the six-month introductory price discount.
Customers also complained to the PUC’s Bureau of Consumer Services, which referred the matter for an investigation. In response to the PUC’s investigation, HIKO provided all requested information, which included a spreadsheet of 14,689 invoice entries for the first four months of 2014. That included invoices issued above the introductory discounted rate as well as invoices that were duplicate “re-bills.” ALJ Decision at 18, Finding of Fact No. 69.
Based on the information provided by HIKO, the PUC’s Bureau of Investigation and Enforcement (I & E) filed a complaint, alleging that each of HIKO’s 14,689 invoices constituted a separate violation of the PUC’s regulation, which requires an EGS to bill at the “agreed upon price, stated in the disclosure statement.” 52 Pa. Code § 54.4(a).[3] The complaint requested a civil penalty of $14,689,000, or $1,000 for each alleged violation. HIKO filed an answer with new matter, asserting, inter alia, that the requested penalty was grossly disproportionate. HIKO Answer, New Matter ¶ 11; Reproduced Record at 83a (R.R.-). The PUC appointed Elizabeth H. Barnes and Joel H. Cheskis to serve as Administrative Law Judges to hear evidence in the case and recommend a decision.
In the meantime, the Office of Attorney General, by its Bureau of Consumer Protection and its Office of Consumer Advocate (collectively, Attorney General), filed *1117 a complaint with the PUC, accusing HIKO of misleading marketing and improper billing. The PUC appointed ALJ Barnes and ALJ Cheskis to conduct a hearing on the Attorney General’s complaint. HIKO sought to consolidate the two proceedings, but the ALJs denied its request.
The Attorney General and HIKO settled their litigation. HIKO agreed to pay $2,025,383.85 into a refund pool, in addition to the refund of $159,320.15 it had already made to affected customers. HIKO agreed to give customers that had enrolled in HIKO’s introductory discount program a refund that gave them the benefit of their bargain.[4] HIKO further agreed to cease accepting new customers until June 30, 2016; to pay up to $50,000 for the costs and expenses related to administering the refund pool; and to contribute $25,000 to the local EDC hardship funds. The parties submitted the settlement to the ALJs for review, and on August 21, 2015, the ALJs approved the settlement between the Attorney General and HIKO.
The very same day, the ALJs issued a decision in I & E’s enforcement action against HIKO and ordered a civil penalty of $1,836,125. In so doing, the ALJs referred to the PUC’s Statement of Policy on civil penalties, which states:
(a)The [PUC] will consider specific factors and standards in evaluating litigated and settled cases involving violations of 66 Pa. C.S. (relating to Public Utility Code) and this title. These factors and standards will be utilized by the [PUC] in determining if a fine for violating a [PUC] order, regulation or statute is appropriate, as well as if a proposed settlement for a violation is reasonable and approval of the settlement agreement is in the public interest.
(b) Many of the same factors and standards may be considered in the evaluation of both litigated and settled cases. When applied, in settled cases, these factors and standards mil not he applied in as strict a fashion as in a litigated proceeding. The parties in settled cases will be afforded flexibility in reaching amicable resolutions to complaints and other matters so long as the settlement is in the public interest. The parties to a settlement should include in the settlement agreement a statement in support of settlement explaining how and why the settlement is in the public interest. The statement may be filed jointly by the parties or separately by each individual party.
(c) The factors and standards that will be considered by the [PUC] include the following:
(1) Whether the conduct at issue was of a serious nature. When conduct of a serious nature is involved, such as willful fraud or misrepresentation, the conduct may warrant a higher penalty. When the conduct is less egregious, such as administrative filing or technical errors, it may warrant a lower penalty.
(2) Whether the resulting consequences of the conduct at issue were of a serious nature. When consequences of a serious nature are involved, such as personal injury or *1118 property damage, the consequences may warrant a higher penalty.
(3) Whether the conduct at issue was deemed, intentional or negligent. This factor may only be considered in evaluating litigated cases. When conduct has been deemed intentional, the conduct may result in a higher penalty.
(4) Whether the regulated entity made efforts to modify internal practices and procedures to address the conduct at issue and prevent similar conduct in the future. These modifications may include activities such as training and improving company techniques and supervision. The amount of time it took the utility to correct the conduct once it was discovered and. the involvement of top-level management in correcting the conduct may be considered.
(5) The number of customers affected and the duration of the violation.
(6) The compliance history of the regulated entity which committed the violation, An isolated incident from an otherwise compliant utility may result in a lower penalty, whereas frequent, recurrent violations by a utility may result in a higher penalty.
(7) Whether the regulated entity cooperated with the [PUC] ’s investigation. Facts establishing bad faith, active concealment of violations, or attempts to interfere with [PUC] investigations may result in a higher penalty.
(8) The amount of the civil penalty or fine necessary to deter future violations. The size of the utility may be considered to determine an appropriate penalty amount.
(9) Past [PUC] decisions in similar situations.
(10) Other relevant factors.,.
52 Pa. Code § 69.1201. The ALJs addressed some, but not all, of the above-listed ten factors.
The ALJs found that HIKO made a conscious decision not to bill at the agreed upon six-month introductory price in the disclosure statement given to approximately 5,700 customers. They found the resulting “overcharges” to constitute serious violations but rejected the $14.69 million penalty proposed by I & E. The ALJs concluded that a civil penalty of $1.84 million, approximately 25% of HIKO’s annual gross revenue, in addition to $160,000 in refunds and HIKO’s agreement to provide an additional $1.67 million in refunds to the same customer class, constituted a “reasonable deterrence” to future violations. ALJ Decision at 50.
In reviewing past .PUC decisions, the ALJs noted' that there were “not many fully litigated cases specifically regarding Section 54.4(a) of the [PUC] ’s regulations.” ALJ Decision at 50. The ALJs disregarded the much lower civil penalties the PUC had imposed on other EGS companies that had also overcharged their customers during the polar vortex because they were the result of settlements. The ALJs reasoned that settled cases do not have any prece-dential value to a litigated case.
To calculate the $1,836,125 civil penalty, the ALJs treated each spreadsheet invoice entry as a violation, for a total of 14,689 violations. The ALJs multiplied that number by $125, the aggregate average overcharge per customer. The'ALJs concluded that the $1,836,125 penalty was “appropriate upon consideration of the ten factors and standards.” ALJ Decision at 64, Conclusion of Law No. 12. Acknowledging that a civil penalty of this magnitude was “unprecedented,” the ALJs rationalized its size by noting that the $125 per violation was far less than the $1,000 per violation *1119 penalty requested by I & E. ALJ Decision at 62.
HIKO filed exceptions with the PUC. It argued that the penalty recommended by the ALJs could not be reconciled with the PUC’s Statement of Policy for calculating an appropriate civil penalty. It also argued that the ALJs erred in basing the penalty on the number of spreadsheet invoices instead of the number of customers or the number of decisions by HIKO management. It further argued that the $1,836,126 civil penalty was grossly disproportionate because it was nearly 80 times higher than the civil penalties imposed on the EGS companies that had engaged in the same conduct during the same period of time and for the same reason, ¿a, unexpected cost increases caused by the polar vortex. The ALJs improperly disregarded those other decisions where the penalties ranged from $25,000 to $125,000 simply because they were settled cases. HIKO was not able to settle with I & E because it refused to consider any penalty below several million dollars.
On December 3, 2016, the PUC issued the instant adjudication denying HIKO’s exceptions. The PUC observed that “HIKO effectively treated its own customers as the financial guarantors of its own business plan, which backed contracts offering customers guaranteed savings with what was essentially a speculative supply portfolio based exclusively on spot market purchases.” PUC Adjudication at 44. Because the $125 per violation was comparable to HIKO’s average overcharge of $124, the PUC concluded that the penalty was appropriate. The PUC held that its other decisions, where the penalty, approved was reached by settlement, were entitled to little weight because HIKO had required I & E to litigate.
In its appeal to this Court, HIKO argues that the PUC imposed a grossly disproportionate penalty that violated the PUC’s Statement of Policy and the excessive fines clauses of the United States and Pennsylvania Constitutions.[5] It contends that the $1,836,125 civil penalty is grossly disproportionate to the sanctions levied against other EGSs for the same, and even more egregious misconduct, that occurred at the same time period. HIKO further argues that the PUC erred in determining the number of violations on a “per invoice” basis, which was never proved by the I & E.
This Court’s review of PUC adjudications is governed by Section 704 of the Administrative Agency Law, which states:
After hearing, the court shall affirm the adjudication unless it shall find that the adjudication is in violation of the constitutional rights of the appellant, or is not in accordance with the law, or that the provisions of Subchapter A of Chapter 5 (relating to practice and procedure of Commonwealth agencies) have been violated in the proceedings before the agency, or that any finding of fact made by the agency and necessary to support its adjudication is not supported by substantial evidence.
2 Pa. C.S. § 704. See Barasch v. Pennsylvania Public Utility Commission, 507 Pa. 561, 493 A.2d 653, 655 (1985). Whether an agency decision is “in accordance with law” also considers whether the agency’s determination represents an abuse of discretion. Fraternal Order of Police v. Pennsylvania *1120 Labor Relations Board, 557 Pa. 586, 735 A.2d 96, 99 (1999). The abuse of discretion standard does not allow the appellate court to substitute its judgment for that of the agency. In re Petition of Acchione, 425 Pa. 23, 227 A.2d 816, 820 (1967).
In support of its argument that the $1,836,125 civil penalty is grossly disproportionate, HIKO directs the Court’s attention to two recent PUC decisions, Commonwealth v. IDT Energy, Inc.[6] and Commonwealth v. Respond Power LLC.[7] Those enforcement proceedings arose during the same confluence of events in 2014: abnormally cold weather attributable to the “polar vortex,” record breaking use of natural gas and electricity, and a dramatic increase in wholesale market prices for electrical energy.
In the first case, the Attorney General accused IDT Energy, an EGS, of making misleading and deceptive promises of savings; switching customers without their consent (a practice known as “slamming”); and providing inaccurate pricing information. This resulted in overcharges in the amount of $6.5 million. IDT Energy, ALJ Decision (11/19/2015) at 36. Under its settlement with the Attorney General, IDT Energy agreed (1) to pay $6,577,000 in refunds; (2) to pay a $25,000 civil penalty; (3) to contribute $75,000 to a local EDC hardship fund; and (4) to modify its business practices. The ALJs approved the settlement in its entirety. Notably, the ALJs rejected an intervenor’s objection that the $25,000 civil penalty and the $75,000 contribution to the hardship funds were inadequate to deter future violations. Instead, the ALJs specifically found the $25,000 civil penalty to be “reasonable and in the public interest.” Id. at 46. The PUC entered a decision adopting the ALJs’ recommended approval. IDT Energy, PUC Adjudication (6/30/2016) at 67.
In the second case, the Attorney General accused Respond Power LLC, another EGS, of “making misleading and deceptive claims, making misleading and deceptive promises of savings, slamming and failing to provide accurate pricing information.” Respond Power, ALJ Decision (5/17/2016) at 1. This conduct resulted in approximately $5 million in overcharges to its customers. Id. at 19. Under the settlement with the Attorney General, Respond Power agreed (1) to pay $4,122,224.91 in refunds in addition to the $971,279.45 it had already refunded; (2) to pay a $125,000 civil penalty; (3) to contribute $50,000 to EDC hardship funds; and (4) to make modifications to its business practices. Id. at 1. The ALJs approved the settlement in its entirety, finding that the $125,000 civil penalty and the $50,000 contribution to the hardship funds constituted a “reasonable” deterrent and was “in the public interest.” Id. at 50-51. The ALJs reasoned:
Although the civil penalty constitutes a small fraction of the amount provided in the Refund Pool, we believe that the provisions of the Settlement must be considered as a whole, not piecemeal. When doing’ so, the Settlement as a whole deters future violation, is in the public interest and warrants being adopted.
Id. at 62. The PUC entered a decision adopting the ALJs’ recommended approval. Respond Power, PUC Adjudication (8/11/2016) at 1.
Even though HIKO’s conduct was very similar to that committed by the respondents in IDT Energy and Respond Power, *1121 it has been ordered to pay a civil penalty that is 73% higher than the penalty in IDT Energy and 15% higher than the penalty in Respond Power. The conduct of the respondents in IDT Energy and Respond Power was more egregious because it included violations in addition to their common violation of 52 Pa. Code § 54.4(a). IDT Energy and Respond Power engaged in misleading and deceptive practices that included “slamming” customers. I & E never accused HIKO of engaging in such conduct. To the contrary, the ALJs found, specifically, that HIKO did not intend to defraud its customers in its initial price offering:
[T]here is no evidence to support a finding that HIKO intended in its August offering to defraud customers initially or in advance of the offering. Rather, the testimony is convincing that the company based its offering upon an 18-month historical data which showed price elasticity and stability in the spot market.
ALJ Decision at 51 (internal citation omitted). The ALJs concluded that HIKO’s misconduct was limited to one violation, i.e., deviating from the agreed upon discounted rate in violation of 52 Pa. Code § 54.4(a).
Notwithstanding these factual differences that favored HIKO, the ALJs imposed a penalty of $1.84 million. This was grossly disproportionate to the $25,000 civil penalty imposed on IDT Energy for its $6.5 million in overcharges, and the $125,000 civil penalty imposed on Respond Power for its $5 million in overcharges. Notably, the ALJs stated that the $125,000 civil penalty imposed on Respond Power was reasonable when the- settlement taken “as a whole deters future violation.” Respond Power, ALJ Decision (5/17/2016) at 62. The ALJs did not consider HIKO’s “settlement as a whole” with the Attorney General, which required HIKO to pay $2,025,383.85 into a refund pool (on top of $160,000 it had already voluntarily refunded); $50,000 in expenses to administer the refunds; and $25,000 to the EDC hardship funds. The same ALJs made the decisions in HIKO, IDT Energy and Respond Power. Their different outcomes cannot be reconciled.
The PUC rationalizes the differences by explaining that it applies the ten factors in its Statement of Policy differently for settled and for litigated cases. That Statement of Policy states, in pertinent part, as follows:
(b) Many of the same factors and standards may be considered in the evaluation of both litigated and settled cases. When applied in settled cases, these factors and standards will not be applied in as strict a fashion as in a litigated proceeding. The parties in settled cases will be afforded flexibility in reaching amicable resolutions to complaints and other matters so long as the settlement is in the public interest. The parties to a settlement should include in the settlement agreement a statement in support of settlement explaining how and why the settlement is in the public interest. The statement may be filed jointly by the parties or separately by each individual party.
52 Pa. Code § 69.1201(b) (emphasis added). Because it does not apply the factors as strictly in a settled ease as in a litigated case, the PUC contends that settled cases do not have any precedential value. PUC Adjudication at 26. This rationale is inconsistent with the PUC’s own Statement of Policy.
First, the Statement of Policy commits the PUC to look at “past Commission decisions” involving similar misconduct. 52 Pa. Code § 69.1201(c)(9). The policy says “past decisions” without regard to whether the decision was made in a litigated case or in *1122 a settled case. All penalties, whether reached by settlement or by litigation, require a decision of the PUC. Here, the only “past decisions” that were similar to HIKO’s were PUC decisions approving settlements.
Second, in every PUC decision approving a settlement, there must be a finding that the penalty will deter future violations and is in the public interest. The ALJs found that IDT Energy’s penalty of $25,000 would deter future violations and was in the public interest. The ALJs needed to explain why HIKO needs to pay a penalty of $1.84 million for the same conduct. The 'purpose of the penalty is to deter future violations, not to deter litigation. Every utility has the right to be heard.
Third, the ALJs approved the Attorney General’s settlement with HIKO as in the public interest, even though it did not include any civil penalty. The Attorney General, instead, looked for a contribution to the EDC hardship funds and the creation of a refund pool.
The PUC imposed penalties against other EGSs for the same violation, arising during the same confluence of weather and market conditions, at a fraction of that imposed upon HIKO. HIKO argues that it did not “elect” to litigate this case. Rather, I & E never presented HIKO with a realistic settlement of its demand for $15 million in civil penalties and a license revocation. HIKO Reply Brief at 27. Because I & E would not negotiate, HIKO asserts it had no practical alternative except to litigate. HIKO Brief at 48.
Deterrence is a consideration in any civil penalty. A penalty deters the utility subject to the enforcement action from repeating the violation and other utilities from committing a violation. In this way, the PUC maintains discipline in the utility industry. HIKO acknowledges that deterrence requires the exercise of judgment and that the PUC is not obligated to impose the exact same amount of penalty in every overcharge case. HIKO even acknowledges a lower civil penalty is a common feature to a settlement. Nevertheless, the meaning of “deterrence” should not “mean something different in the settlement context than in a litigated case.” HIKO Reply Brief at 9.1 agree.
The amount of the penalty the PUC imposed in other decisions involving similar, albeit more egregious, misconduct by EGSs was held to be reasonable to deter future violations. This amount ranged from $25,000 to $125,000. If these amounts have been determined to have a deterrent effect against future misconduct, then, logically, all penalties imposed for the same conduct that has already taken place during the same period of time should relate to that range. If the misconduct is repeated during the next polar vortex, that is the time to impose higher penalties in excess of the range of $25,000 to $125,000.
The $1,836,125 penalty violated the excessive fine clauses of the United States and Pennsylvania Constitutions. The majority does not address this point because it concludes that it was waived. I disagree. HIKO asserted in its Answer to I & .E’s Complaint that the penalty sought by I & E was “grossly disproportionate.” HIKO Answer to I & E’s Complaint, New Matter ¶ 11; R.R. 83a. HIKO’s exception to the ALJs’ penalty decision also asserted that the civil penalty was “grossly disproportionate.” HIKO Exception to ALJs’ Initial Decision at 30-31; R.R. 1003a-1004a. A party may identify additional legal authority on appeal to support a claim it raised before a lower court or agency. See Allegheny County v. Commonwealth, 507 Pa. 360, 490 A.2d 402 (1985) (rejecting Commonwealth’s waiver claim because the County “merely identified additional legal *1123 authority in support of its claims; the County’s basic theory is the same[.]”). Id. at 413 n.9. HIKO is not asserting a new claim but offering additional legal authority to support its claim that the civil penalty is grossly disproportionate.[8]
The Eighth Amendment to the United States Constitution provides that “[ejxces-sive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.” U.S. CONST, amend. VIII. The Pennsylvania Constitution contains a similar provision: “[excessive bail shall not be required, -nor excessive fines imposed, nor cruel punishments inflicted;” PA. CONST. art. I, § 13. Our Supreme Court has observed that the excessive fines clause set forth in the Pennsylvania Constitution is coextensive with the Eighth Amendment to the U.S. Constitution. Commonwealth v. Eisenberg, 626 Pa. 512, 98 A.3d 1268, 1281 (2014).
To determine whether the excessive fines clause has been violated, a court considers “whether the statutory provision imposes punishment; and if so, whether the fine is excessive.” Commonwealth v. 5444 Spruce Street, 890 A.2d 35, 38 (Pa. Cmwlth. 2006) (quoting Commonwealth v. 5444 Spruce Street, 574 Pa. 423, 832 A.2d 396, 399 (2003)). The PUC acknowledges that the $1,836,125 civil penalty imposed a punishment. To determine whether that penalty was excessive, we must employ a proportionality analysis, ie., a comparison of the amount of the fine to the gravity of the offense. Eisenberg, 98 A.3d at 1281. Whether a fine is unconstitutionally excessive is a question of law, rendering, the standard of review de novo and the scope of review plenary. Id. at 1279.
In applying the proportionality test, our Supreme Court has pointed to Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), which directs the court to compare the magnitude of the fine to the treatment of other offenders in the same jurisdiction, and to the treatment of the same offense in other jurisdictions. Eisenberg, 98 A.3d at 1282. Our Supreme Court has further noted the special need for “intrá-Pennsylvania” proportionality and explained that “comparative and proportional justice is an imperative within Pennsylvania’s own borders.” Id. at 1283 (quoting Commonwealth v. Baker, 621 Pa. 401, 78 A.3d 1044, 1055 (2013) (Castille, C.J., concurring, joined by Saylor and Todd, JJ.)).
It was incumbent on, the PUC to ensure that the civil penalty it imposed on HIKO could be harmonized with its other decisions imposing civil penalties on utilities that committed similar violations. It did not do so. Accordingly, the grossly disproportionate civil penalty imposed on HIKO, inter alia, violates the prohibition against excessive fines found in both the United States and Pennsylvania Constitutions as well as the PUC’s own Statement of Policy. '
HIKO also challenges the methodology by which its- penalty was calculated. The ALJs found 14,689 violations and then multiplied that number by $125. In adopt *1124 ing this penalty, the PUC found that $125 per violation was appropriate because it was comparable to the average $124 overcharge for customers enrolled in the introductory price discount program. PUC Adjudication at 48. However, the $124 figure, as found by the ALJs, was “per customer” and not per invoice. ALJ Decision at 13, Finding of Fact No. 29 (“[t]he average overcharge that HIKO billed customers was $124”). Under the PUC’s own logic, the $125 number should have been multiplied by 5,708, ie., the number of customers. This results in a penalty of $713,500, which is still higher than any of the penalties imposed in the other cases but would at least be consistent with the PUC’s own stated rationale for its penalty decision.
Before the ALJs, HIKO’s expert, Charles Cicchetti, explained the difference between a tariff violation and a violation of the regulation at 52 Pa. Code § 54.4(a). HIKO’s invoiced charges were not illegal in themselves; they simply did not conform to the disclosure statements. The PUC did not approve HIKO’s prices; the marketplace set those prices. HIKO’s expert opined that HIKO committed one violation, ie., the decision not to charge at “the agreed upon prices in the disclosure statement” lest it be forced out of business, which would have been more harmful to consumers. 52 Pa. Code § 54.4(a). Upon questioning by ALJ Cheskis, Cicchetti conceded that under his logic, each billing cycle could constitute a separate violation, ie., four violations. R.R. 583a.
However, the finding that HIKO committed 14,689 violations of Section 54.4(a) is not supported by substantial evidence. That number was based upon the number of invoice entries on HIKO’s spreadsheets, which included rebillings, or duplicate invoices, as the PUC acknowledged. Nevertheless, the PUC used the 14,689 figure for the stated reason that “HIKO had the opportunity to correct mistakes in I & E’s calculation,” and “HIKO’s failure to do so resulted in its failure to carry its burden of persuasion once that burden shifted from I & E to [HIKO].” PUC Adjudication at 32-33. The PUC’s explanation defies the fundamentals on burden of proof. It was I & E’s burden to prove 14,689 violations; it was never HIKO’s burden to prove the number of times it violated 52 Pa. Code § 54.4(a).
Section 332(a) of the Public Utility Code provides that “[e]xcept as may be otherwise provided in section 315 (relating to burden of proof) or other provisions of this part or other relevant statute, the proponent of a rule or order has the burden of proof.” 66 Pa. C.S. § 332(a). Factual findings must be supported by substantial evidence, which is “such relevant evidence that a reasonable mind might accept as adequate to support a conclusion.” Coalition for Affordable Utility Services and Energy Efficiency in Pennsylvania v. Pennsylvania Public Utility Commission, 120 A.3d 1087, 1095 (Pa. Cmwlth. 2015).
At the hearing, Cicchetti, HIKO’s expert, also testified about the spreadsheets. He explained as follows:
There were a lot of overcharges where, when you look at the data, there was probably at least 300 instances where it was one of these bills dated one day, and then two days later it was modified and it was another bill. And I’m not sure the customer even saw that. It may have just been between HIKO and the utility.
Notes of Testimony, 4/20/2015, at 210-211 (N.T.-); R.R. 576a-77a. The ALJs accepted this testimony and found that the 14,689 invoice entries included invoices that were subsequently corrected on “re-bills.” ALJ Decision at 18, Finding of Fact No. 69. The ALJs faulted Cicchetti for the stated reason that he was “unspecific about which line items were incorrectly *1125 included in the calculations. He also seemed unsure whether the customer was billed the re-bill or not.” ALJ Decision at 31. However, it was not Mr. Cicchetti’s job to carry I & E’s water in proving its case against HIKO.
I & E had the burden to prove that each of the 14,689 invoice entries constituted a separate violation of Section 54.4(a). I & E could have done discovery to establish the actual significance of these invoice entries; it could have also obtained copies of the actual customer invoices. Instead, I & E chose only to present HIKO’s spreadsheets. Simply, the ALJs’ finding that HIKO violated Section 54.4(a) 14,689 times is not supported by substantial evidence.
The PUC abused its discretion in imposing the $1,836,125 civil penalty. The penalty is grossly disproportionate to the penalties imposed on other EGSs for the same misconduct. As such, the penalty was not consistent with the PUC’s own Statement of Policy, and it violated the constitutional proscriptions against excessive fines. The penalty was computed by using a flawed methodology because I & E did not prove that HIKO violated the regulation 14,689 times but only that it generated 14,689 data entries. I would reverse the PUC’s order and remand for further proceedings to recalculate a penalty that conforms to the PUC’s Statement of Policy and the constitutional limits on penalties.
Judge Cohn Jubelirer and Judge Covey join in this dissenting opinion.

. HIKO’s welcome letter stated that the rate "is guaranteed to be 1-7% less than [the] local Utility's price to compare, for the first six months billing cycles. After the six-month introductory rate plan, [customers] will be automatically rolled over onto a competitive variable rate, which will be determined by HIKO Energy, based on numerous key Tac- *1116 tors, including current market conditions and climate.” ALJ Decision at 15, Finding of Fact No. 45. The Disclosure Statement provided that the rate is the "price stated at sign-up and confirmed in [customers’] written Welcome Letter from HIKO.” ALJ Decision at 15, Finding of Fact No. 46.

. PJM is a regional transmission organization that coordinates the movement of wholesale electricity in 13 states (including Pennsylvania) and the District of Columbia.

. This regulation states:
(a) EGS prices billed must reflect the marketed prices and the agreed upon prices in the disclosure statement.
52 Pa. Code § 54.4(a).

. During the first four months of 2014, HIKO lost 70 percent of its customers in Pennsylvania; 80 percent of those were in the guaranteed discount program. In large part, this was attributed to HIKO's decision to stop marketing in January 2014. Some customers left the state or switched utilities. The refund pool was created to pay the administrative expenses associated with locating the customers entitled to a refund as well as paying for the refunds themselves. According to HIKO’s expert, Charles Cicchetti, a number of the overcharges "were less than a dollar. Quite a few under $10." R.R. 577a.

. Specifically, the Eighth Amendment of the U.S. Constitution provides: "[ejxcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.” U.S. Const. amend. VIII, The Pennsylvania Constitution contains similar language, Pa. Const. art. I, § 13 ("[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel punishments inflicted”).

. PUC Docket No. C-2014-2427657, penalty approved by the PUC on June 6, 2016.

. PUC Docket No. C-2014-2427659 & 2438640, 2016 WL 4366589, penalty approved by the PUC on August 11, 2016.

. Section 753(a) of the Administrative Agency Law provides that “if a full and complete record of the proceedings before the agency was made such party may not raise upon appeal any other question not raised before the agency (notwithstanding the fact that the agency may not be competent to resolve such question) unless allowed by the court upon due .cause shown.” 2 Pa. C.S. § 753(a).
Thróughout the administrative proceeding, HIKO challenged the proposed penalty as grossly disproportionate. It challenged I & E’s proposed penalty of $14,689,000, and then challenged the ALJs’ recommended penalty of $1,836,125. HIKO now challenges the PUC’s decision to impose a penalty of $1,836,125 as grossly disproportionate.